Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| KEREN ORTIZ VIZCARRONDO Y JAVIER NIEVES FALERO, ambos por sí y en representación de la Sociedad Legal de Gananciales compuesta por ambos<br><br>Demandantes - apelados<br><br>v.<br><br>UNVERSAL INSURANCE COMPANY, WENDY´S 06922 (RÍO GRANDE), GRUPO COLÓN GERENA, WENDCO MANAGEMENT, INC., y otros<br><br>Demandados - apelantes | KLAN202300536<br>y<br>KLCE202300698<br><br>*consolidados con*<br><br>KLAN202300546 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Sobre:<br>Daños y perjuicios<br><br>Caso núm.:<br>FA2020CV00554 |

Panel Integrado por su presidente, el Juez Rodríguez Casillas, la Jueza Mateu Meléndez y el Juez Marrero Guerrero.

Rodríguez Casillas, juez ponente.

**SENTENCIA**

En San Juan, Puerto Rico a 29 de abril de 2024.

El **21 de junio de 2023**, comparecieron ante nos la aseguradora Universal Insurance Company (en adelante, "Universal"), Wendy's (Río Grande), WENDCO Management Inc. (en adelante, "WENDCO"), y el Grupo Colón Gerena (**conjuntamente y en adelante, los Apelantes-Demandados**), mediante el recurso de apelación **KLAN202300536** y el recurso de *certiorari* **KLCE202300698**.

Por otra parte, el **23 de junio de 2023** la señora Keren Ortiz Vizcarrondo (en adelante, "señora Ortiz Vizcarrondo o la perjudicada") y su esposo, señor Javier Nieves Falero (en adelante, "señor Nieves Falero o esposo"), por sí y en representación de la sociedad legal de gananciales compuesta por ambos

(**conjuntamente y en adelante, los Apelados-Demandantes**), instaron el recurso de apelación **KLAN202300546**.

En ambos recursos de apelación —**KLAN202300536 y KLAN202300546**— se nos solicita la revisión de la *Sentencia* dictada el 13 de abril de 2023 y notificada el 14 de abril de 2023, por el Tribunal de Primera Instancia, Sala Superior de Fajardo (en adelante, "TPI o foro primario"). Mientras que en el aludido recurso de *certiorari* —**KLCE202300698**— se solicita la revisión de la imposición de costas en el pleito de referencia.

El **28 de junio de 2023**, consolidamos los recursos y luego de varios trámites procesales quedaron perfeccionados, por lo cual, procedemos a **confirmar** la *Sentencia* apelada en los casos **KLAN202300536** y **KLAN202300546**. Asimismo, se expide el auto de *certiorari* **KLCE202300698** y se **confirma** la imposición de costas en el pleito.

**-I-**

El presente caso tiene su génesis el **8 de septiembre de 2020**, cuando los Apelados-Demandantes presentaron una acción en daños y perjuicios contra del restaurante Wendy's de Río Grande, el Grupo Colón Gerena, WENDCO y Universal. En síntesis, adujeron que el 18 de septiembre de 2019, la señora Ortiz Vizcarrondo sufrió una caída por la negligencia de dicho restaurante de comida rápida, ya que el piso estaba húmedo y no había un aviso de tal situación, por lo que reclamaron daños sufridos.

El **15 de enero de 2021**, los Apelantes-Demandados contestaron la demanda.

Culminados los trámites procesales de rigor, el juicio en su fondo fue celebrado los días **8, 9 y 22 de febrero de 2023**. Finalizado el desfile de prueba, Universal solicitó un término para expresarse en torno a una alegación de destrucción de evidencia que esgrimieron los Apelados-Demandantes.

Concedido el término, el **21 de marzo de 2023**, Universal interpuso un *Memorando de Derecho* en torno a la doctrina de expoliación. En respuesta, el **4 de abril de 2023**, los Apelados-Demandantes instaron un *Memorando de Derecho de la Parte Demandante Respecto a la Aplicación de la Doctrina de "Spoliation" al Presente Caso.*

El **13 de abril de 2023**,[1] el TPI dictó la *Sentencia* apelada en la que declaró *Con Lugar* la demanda y formuló las siguientes determinaciones de hechos:

**1.** El 18 de septiembre de 2019, aproximadamente a la 1:08 p.m., la codemandante, Sra. Karen Ortiz Vizcarrondo (**Ortiz**), compró alimentos en el restaurante de servicio rápido Wendy's #06922, ubicado en la Carr. #3, Km 24.5, Bo. Guzmán Abajo, en Río Grande, Puerto Rico. Cuya tienda pertenece a la parte demandada. Allí, la codemandante, Sra. Ortiz Vizcarrondo, fue al área de los condimentos, tomó lo necesario y cuando se disponía a salir resbaló y se cayó al suelo (el **Accidente**). [Estipulado, Entrada 40.]

**2.** Cuando se cayó, Ortiz estaban (sic) cargando los alimentos y refrescos que había comprado. La caída causó que los refrescos se derramaran en el suelo. *Testimonios Ortiz y Carmona.*

**3.** Universal Ins. Co., Inc. (**Universal**) tenía expedida una póliza de seguros a favor de los codemandandos, Wendy's #06922 (Río Grande), Grupo Colón Gerena y Wendco Management, Inc., que está sujeta a sus cláusulas, términos, condiciones y exclusiones. [Estipulado, Entrada 40.]

**4.** Luego de la caída, se le ofreció ayuda y/o (sic) asistencia a Ortiz. [Estipulado, Entradas 40 y 43.]

**5.** La gerente Sra. Edmee Carmona (**Carmona**) procedió a tomarle los datos a Ortiz y a llenar el Informe de Incidente. [Estipulado, Entradas 40 y 43.]

**6.** El 19 de septiembre de 2019, la gerente de turno, Sra. Edmee Carmona, le notificó a las oficinas centrales de la parte demandada de la ocurrencia de la caída que nos ocupa. [Estipulado, Entrada 40.]

**7.** Cuando ocurrió el Accidente, Carmona no estaba en el área de restaurante de la Tienda, sino en su oficina, por lo cual no vio la caída, pero cuando le avisaron salió y observó que acababan de pasar mapo en el área de los condimentos. *Testimonio de Edmee Carmona.*

---

[1] Notificada el 14 de abril de 2023.

**8.** El Aviso de Incidente recoge las expresiones de la Demandante justo después del Accidente como sigue: *"Aparentemente el empleado del salón pasó el mapo en el área de condimentos. Cliente pasó aparentemente a surtirse de dichos condimentos y esta aparentemente resbaló golpeándose en el área derecha del cuerpo. Esta alegadamente se aguantó con su mano del piso el cual alega que sufre mucho dolor." "Alegadamente se golpeó en el área derecha de su cuerpo incluyendo su mano derecha hasta su hombro." "Comentarios del Perjudicado: ¡Estoy nerviosa y me duele mucho!" "Cliente alega que le duele todo el cuerpo en la parte derecha y su muñeca hasta el hombro." Exhibit 1 de los Demandantes.*

**9.** Carmona le ofreció a la Demandante llamar una ambulancia, pero ella declinó la oferta y salió de la Tienda caminando sin asistencia. *Testimonio de Edmee Carmona; Testimonio de la Demandante.* Carmona también le informó a Ortiz el número de teléfono de las oficinas centrales de WENDCO instruyéndole que llamara allí de necesitar algo adicional. *Testimonio de Edmee Carmona.*

**10.** Las (sic) todas las tiendas de WENDCO en Puerto Rico tienen cámaras de seguridad. *Testimonio Ana Alcántara Moya.*

**11.** La Tienda donde ocurrió el Accidente tiene cámaras dentro y fuera del restaurante. *Testimonio de Edmee Carmona.*

**12.** WENDCO subcontrata el servicio de cámaras de seguridad a un tercero, ABC Security Company. *Testimonio Ana Alcántara Moya.*

**13.** El proceso establecido por WENDCO es que la gerente de la tienda prepara y notifica un Aviso de Incidente a las oficinas centrales, donde la Sra. Ana Alcántara lo recibe y remite a los corredores de seguros de la empresa. *Testimonio Ana Alcántara Moya.* No suele llevar a cabo trámite para preservar evidencia de vídeo. *Id.*

**14.** El relato del Accidente y de la reacción de la Demandante en el Aviso de Incidente describe un incidente lo suficientemente serio para que la Demandada razonablemente anticipara una reclamación en su contra. *Exhibit 1 de los Demandantes.* Sin embargo, la Demandada no tomó medidas en ese momento para preservar las imágenes de las cámaras de seguridad de la Tienda. *Testimonio Ana Alcántara Moya.*

**15.** La Sra. Alcántara de WENDCO recibió el Aviso de Incidente del Accidente el 19 de septiembre de 2019, al día siguiente del Accidente. *Testimonio Ana Alcántara Moya.*

**16.** El 25 de septiembre de 2019, la representación legal de los Demandantes le envió a WENDCO una carta

solicitando *"una copia de los vídeos que recogen la caída en sí de la Sra. Karen Ortiz Vizcarrondo y de 5 horas antes y 3 horas después del área donde acaecieron los hechos"* y *"TODAS las tomas de cámara que reflejan la presencia de la Sra. Ortiz Vizcarrondo en su restaurante." Exhibit 2 de los Demandantes*. La carta también advertía a WENDCO de su obligación de preservar *"TODA PRUEBA relacionad (sic) al caso"* incluyendo los vídeos que allí se solicitan. *Id.* La Carta está fechada 23 de septiembre de 2019, fue enviada por correo certificado el 25 de septiembre de 2019, y recibida por Grupo Colón Gerena (compañía matriz de WENDCO[2]) el 1 de octubre de 2019. *Id.*

**17.** La Sra. Alcántara es la persona dentro de WENDCO a cargo de tramitar las solicitudes de imágenes de las cámaras de seguridad, lo cual hace usualmente a tenor con las órdenes que tramita la Policía de Puerto Rico como parte de sus investigaciones. *Testimonio Ana Alcántara Moya.* De modo que se trata de evidencia en control de la Demandada, aunque no estuviera directamente en su posesión física.

**18.** La Sra. Alcántara recibió la carta el 3 de octubre de 2019, y solicitó a ABC Security Company copia de las imágenes de las cámaras interiores de la Tienda del día y hora aproximada del Accidente el 4 de octubre de 2019. *Testimonio Ana Alcántara Moya.* Esta fue la primera gestión de WENDCO para conseguir las imágenes del Accidente. *Id.* Esto significa que la Demandada tardó tres días en hacer trámite alguno con relación a la notificación de reclamación y preservación de evidencia luego de recibida. ABC Security no contestó la comunicación, y WENDCO no llevó a cabo tramites adicionales para preservar las imágenes. *Id.*

**19.** La parte demandada, no cuenta con el vídeo de la caída de la Sra. Ortiz. [Estipulado, Entrada 40.] La Demandada no trajo evidencia de los protocolos de preservación de récords de su contratista. Tampoco trajo evidencia que nos permita determinar en qué fecha se destruyeron las imágenes de las cámaras de seguridad de la Tienda.

**20.** El Croquis de la tienda, facilitado por la parte demandada fue estipulado. [Estipulado, Entrada 40.]

**21.** La norma y entrenamiento establecido por WENDCO es que la Tienda debe mantenerse limpia y ordenada. No se cierran al público las áreas donde acaban de pasar el mapo, sino que se debe colocar un cono de seguridad amarillo avisando que el piso está mojado. La gerente de turno debe hacer rondas de verificación cada una de cuatro zonas cada 15 o 30 minutos. *Testimonio de Edmee Carmona.* Sin embargo, no hubo evidencia en cuanto a si así se hizo el día del Accidente. No se mantiene bitácora de las gestiones de limpieza. *Id.* Existen documentos que describen los

---

[2] Nota al calce en el original: *Testimonio Ana Alcántara Moya.*

procedimientos de limpieza y mantenimiento, pero no se presentaron en evidencia. *Id.*

**22.** El día del Accidente, Javier Rodríguez colocó un cono en el área de los condimentos y pasó mapo allí. Luego pasó mapo en el centro del salón, y cuando completó esa tarea movió el cono que había colocado en el área de condimentos. *Testimonio y deposición de Javier Rodríguez.*

**23.** Previo al Accidente, Ortiz había padecido de lesiones en la espalda. A saber, un grado de escoliosis y un disco herniado. *Testimonio de Ortiz*, Exhibit Estipulado A, y Exhibit 1 de las Demandadas. Recibió tratamiento para estas lesiones, fue dada de alta, y a la fecha del Accidente estaba asintomática. *Testimonio de Ortiz.*

**24.** Durante el año 1999, Ortiz se cayó por una escalera y se lesionó la rodilla derecha. Recibió tratamiento en el Fondo del Seguro del Estado y fue dada de alta. *Testimonio de Ortiz.* En el 2017, sufrió una lesión en el hombro y rodilla derechos, durante un intercambio con un estudiante. *Id.* Acudió al médico y no recibió terapia. En el 2018, se resbaló sobre el piso mojado cuando limpiaba la marquesina de su casa. Acudió a sala de emergencia. Padeció de dolor por esa lesión temporeramente. *Id.*

**25.** En el año 2003, Ortiz tuvo un accidente de automóvil y se lesionó la espalda. Recibió terapias hasta que el médico de la ACAA le dio de alta. *Testimonio de Ortiz.* Desde entonces, esporádicamente sentía dolor en la espalda, el cual controlaba con medicamentos. *Id.*

**26.** Ortiz tiene un 5% de incapacidad. [Estipulado, Entrada 43.] La Dra. Carmen López Acevedo, perito de la parte Demandante, opinó que dicha incapacidad permanente de Ortiz fue causada por el Accidente. La Dra. López Acevedo opinó que las condiciones que padecía la Demandante previo al Accidente estaban asintomáticas y le permitían desempeñarse sin impedimento hasta que, por causa del Accidente, estas se convirtieron en condiciones sintomáticas que, unidas a las lesiones sufridas por causa del Accidente, resultaron en el grado de incapacidad estipulada. El Dr. Héctor Cortés Santos, perito de las Demandadas, admitió en contrainterrogatorio que esto es posible.[3]

> **a.** La Dra. López fue calificada como perito. Es fisiatra con más de 40 años de experiencia, y certificaciones de la American Board of Physical Medicine and Rehabilitation y la Junta de Licenciamiento y Disciplinas Médicas de Puerto Rico. Ejerce en tres hospitales del sistema de la

---

[3] **Nota al calce en el original**: [v]éase, además, *Rosado v. Supermercado Mr. Special,* 139 DPR 946 (1996), donde el perito había testificado que, *"en lo general, las condiciones de los discos no eran producidas necesariamente por un trauma, pero que se encontraba asintomática, podía concluirse que la sintomatología sufrida posteriormente había sido desencadenada por dicha caída"* y nuestro Tribunal Supremo consideró *"los dolores causados por una condición degenerativa en los discos cervicales, cuya manifestación fue desencadenada por la caída sufrida".*

Universidad de Puerto Rico, y se ha desempeñado como profesora del Recinto de Ciencias Médicas de la Universidad de Puerto Rico desde 1993. Es catedrática de esa institución desde el año 2007 y dirige programas de residencia en fisiatría desde 1989. Figura como coautora en diez publicaciones.

**b.** El Dr. Héctor Cortés Santos fue calificado como perito. Es fisiatra certificado por American Board of Physical Medicine and Rehabilitation. Practica desde varios centros de rehabilitación y hospitales a través de Puerto Rico.

**27.** Los Demandantes son un matrimonio de 26 años con dos hijos adultos. Don Javier Nieves Falero (**Nieves**) ha sufrido por ver a su esposa adolorida, frustrada, y de mal humor por los dolores que sufre y que no superará. Ya apenas tienen vida social, y él ha tenido que asumir tareas del hogar que antes compartían. *Testimonio de Nieves.*

**28.** Ortiz es surda. *Testimonio de Ortiz.*

**29.** Luego del Accidente, Ortiz fue a su casa con la intención de descansar. Al cabo de una hora, su pie derecho se veía hinchado y sitió dolor. *Exhibit 3 y Testimonio de Ortiz.* A medida que pasaba en tiempo incrementaba su dolor. Cuando su esposo llegó a la casa del trabajo, le pidió que la llevara a la sala de emergencias. Allí le recetaron Decadrón y Flexeril. Las próximas semanas seguía sintiendo dolor en el hombro, cadera y tobillo derechos. Visitó al médico, Dr. Arroyo, quien le recetó medicamentos y terapias, y le ordenó un MRI. Los medicamentos mermaban el dolor y las terapias solo conseguían mejorías temporeras. Como no mejoraba, el fisiatra la refirió a un especialista para manejo del dolor. El Dr. Acevedo le practicó bloqueos en dos ocasiones, cuyos efectos también fueron temporeros.

**30.** A pesar de muchas terapias y tres bloques (sic), Ortiz padece dolor continuamente, y, dos o tres veces en semana, cuando no puede soportar el dolor, toma fuertes medicamentos como Tramadol, Medrol Dosepak, Toradol, Celebrex, Fleveril (sic) y Norflex. A veces le duele tanto el brazo que se le hace difícil peinarse, o hasta se le caen las cosas de las manos. Ya no va al cine ni a cenar con su esposo, ni acompaña a sus hijos en sus actividades. Se siente que ya no es la misma persona por causa del dolor.

El foro primario concluyó que la señora Ortiz Vizcarrondo se cayó porque el piso estaba resbaloso y WENDCO no pudo rebatir la existencia de una condición peligrosa. Añadió que tampoco se demostró que el día del accidente se tomaron las medidas necesarias para que el área en donde ocurrió la caída fuera razonablemente

segura. Además, resolvió que no se presentó evidencia que le permitiera concluir que los Apelados-Demandantes incurrieron en negligencia comparada o contribuyente.

En cuanto a la no disponibilidad de las imágenes de las cámaras de seguridad, el TPI resolvió que WENDCO no demostró que dichas imágenes fueran destruidas en el curso ordinario antes que los Apelados-Demandantes solicitaran su preservación. Infirió que al momento del accidente existía una condición peligrosa y no se tomaron las medidas necesarias para que el área donde ocurrió el accidente fuera razonablemente segura.

Concluyó que la señora Ortiz Vizcarrondo sufre una incapacidad parcial permanente a consecuencia del accidente y que padece de dolor constante. Lo anterior, afectó su participación en las tareas del hogar, vida social y actividades de asueto con su familia. Resolvió que el esposo, señor Nieves Falero, también tuvo una pérdida, su vida fue trastocada por el accidente y la transformación de la perjudicada en una persona siempre adolorida, a menudo frustrada o de mal humor por el dolor que le aqueja. En consecuencia, le impuso a los Apelantes-Demandados el pago de $100,000.00 a favor de la señora Ortiz Vizcarrondo y $22,000.00 a su esposo, más intereses y las costas del pleito.

El referido dictamen fue objeto de una reconsideración, a la cual, oportunamente, la parte Apelada-Demandante se opuso. Así, el **24 de mayo de 2023**, notificada en igual fecha, el TPI declaró *No Ha Lugar* la reconsideración. Asimismo, el **18 de abril de 2023**, los Apelados-Demandantes presentaron un *Memorando de Costas,* al cual se opusieron los Apelantes-Demandados. El **15 de mayo de 2023**, el foro primario dictó y notificó una *Resolución* en la cual concedió costas del pleito por la suma de $2,611.00. Aunque los Apelantes-Demandados solicitaron reconsideración, el **24 de mayo de 2023** les fue denegada.

Inconformes, el **21 de junio de 2023** los Apelantes-Demandados comparecieron ante nos, en el recurso de apelación **KLAN202300536** y señalaron los siguientes cuatro (4) errores:

> *1. Erró el TPI al incluir en la Sentencia determinaciones de hechos que no surgen de la prueba presentada en el juicio.*
>
> *2. Erró el TPI al determinar en la Sentencia que existió una condición peligrosa por la cual se les atribuyó negligencia a las partes demandadas, sin considerar la evidencia presentada en el juicio que demostró que medió negligencia comparada y/o (sic) contributiva de parte de la demandante.*
>
> *3. Erró el TPI al no efectuar en la Sentencia el debido análisis de la valorización de los (sic), según requiere la jurisprudencia aplicable a la materia de daños y perjuicios.*
>
> *4. Erró el TPI al determinar en la Sentencia, que las partes apelantes incurrieron en espoliación (sic), lo cual no se sostiene en consideración a la jurisprudencia interpretativa de dicha doctrina en nuestra jurisdicción.*

Además, y en igual fecha, los Apelantes-Demandados presentaron un recurso de *certiorari* **KLCE202300698** en el cual formularon los siguientes dos (2) errores:

> *1. Erró el TPI y abusó de su discreción al no sostener las estipulaciones realizadas por las partes en la Conferencia con Antelación al Juicio.*
>
> *2. Erró el TPI y abuso de su discreción al conceder costas que son contrarias a derecho.*

Por su parte, el **23 de junio de 2023**, los Apelados-Demandantes instaron un recurso de apelación **KLAN202300546**, en el que señalaron los siguientes dos (2) errores:

> *1. El Honorable Tribunal de Primera Instancia, cometió error manifiesto de derecho al no dictaminar que la parte demandada apelada fue temeraria en la litigación del presente caso y que obligó, innecesariamente y contrario a derecho, a la parte demandante apelante tener que pasar por el arduo trabajo de probar todos los elementos de su causa de acción, particularmente, el más importante, la culpa o negligencia.*
>
> *2. El Honorable Tribunal de Primera Instancia, cometió error manifiesto de derecho al no imponer a la parte demandada apelada el pago de alguna suma de honorarios de abogado a favor de la parte demandante apelante y, por consiguiente, intereses presentencia, computados a partir de la fecha en que se presentó la demanda.  (González Ramos v. Pacheco Romero, 2022 TSPR 43).*

Luego de estipular la transcripción de la prueba oral y recibir los escritos de ambas partes, el caso quedó perfeccionado para

nuestra consideración.

**-II-**

**A.**

Al revisar una determinación de un tribunal de menor jerarquía, los tribunales tenemos la tarea principal de auscultar si se aplicó correctamente el derecho a los hechos particulares del caso.[4] Como regla general, los foros apelativos no debemos intervenir con las determinaciones de hechos de los tribunales de primera instancia, su apreciación sobre la credibilidad de los testigos y el valor probatorio conferido a la prueba presentada en sala, pues solo contamos con *"récords mudos e inexpresivos"*.[5] Lo anterior, se fundamenta en la premisa de que el foro primario es quien tiene la oportunidad de escuchar a los testigos declarar y apreciar su *"demeanor"*.[6]

Sin embargo, la norma de deferencia antes esbozada encuentra su excepción y cede cuando la parte promovente demuestra que:

> *[h]ubo un craso abuso de discreción o que el tribunal actuó con prejuicio y parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial.*[7]

A tono con lo antes dicho, por discreción se entiende el *"tener poder para decidir en una forma u otra, esto es, para escoger entre uno o varios cursos de acción"*.[8] No obstante, *"el adecuado ejercicio de la discreción está inexorable e indefectiblemente atado al concepto de la razonabilidad"*.[9] A esos efectos, el Tribunal Supremo de Puerto Rico ha enumerado situaciones que constituyen un abuso de discreción:

---

[4] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013).
[5] *Id.*, págs. 770-771; *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009); *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007).
[6] *Colón v. Lotería*, 167 DPR 625, 659 (2006).
[7] *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689, 709 (2012).
[8] *García v. Asociación*, 165 DPR 311, 321 (2005).
[9] *Ibid.*

*[c]uando el juez, en la decisión que emite, no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; cuando por el contrario el juez, sin justificación y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en el mismo; o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez livianamente sopesa y calibra los mismos.*[10]

En cambio, si la actuación del tribunal no está desprovista de base razonable, ni perjudica los derechos sustanciales de una parte, debe prevalecer el criterio del juez de instancia a quien corresponde la dirección del proceso.[11] En ese sentido, las conclusiones de derecho son revisables en su totalidad por los tribunales apelativos.[12]

Ahora bien, la norma de deferencia antes esbozada no es de aplicación a la evaluación de la prueba pericial y documental. En lo que respecta a las conclusiones de hecho basadas en prueba pericial o documental, los foros revisores nos encontramos en igual posición que los tribunales sentenciadores para apreciarla y adoptar nuestro propio criterio.[13] Incluso, podemos descartarla, aunque sea técnicamente correcta.[14]

**B.**

Según la normativa antes expuesta, los tribunales apelativos, de ordinario, aceptan *"como correctas las determinaciones de hechos de los tribunales de instancia, al igual que su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en sala"*.[15]

A pesar de ello, en ocasiones, la deferencia al arbitrio del juzgador de los hechos no es absoluta.[16] De manera, que:

*[a]unque alguna prueba sostenga las determinaciones de*

---

[10] *Ramírez v. Policía de P.R.*, 158 DPR 320, 340-341 (2002).
[11] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013); *Sierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).
[12] *Dávila Nieves v. Meléndez Marín*, supra, pág. 770.
[13] *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011); *Arrieta v. De la Vega*, 165 DPR 538, 551 (2005).
[14] *Ibid.*
[15] *Dávila Nieves v. Meléndez Marín*, supra, pág. 771.
[16] *Ibid.*

*hechos del tribunal, si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas.[17]*

En cuanto a las determinaciones de hechos y conclusiones de derecho, la Regla 42.2 de Procedimiento Civil apunta que:

*[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos.[18]*

Dicho de otro modo, las determinaciones de hechos basadas en la credibilidad conferida por el juzgador a los testigos que declaren ante sí, merecen gran deferencia.[19] Por tanto, nuestra intervención con la evaluación de la prueba testifical procede únicamente cuando un análisis integral de la misma *"nos cause una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia"*.[20] De ahí, que nuestro reglamento establece que cuando una parte señale algún error relacionado con la suficiencia de la prueba testifical o la apreciación errónea de la misma, deberá someter una transcripción, exposición estipulada o narrativa de la prueba.[21]

En cuanto a la evaluación y suficiencia de la prueba, la Regla 110 de Evidencia establece los principios que el juzgador deberá evaluar a la hora de determinar cuáles hechos quedaron establecidos.[22] En lo que nos concierne, la mencionada Regla 110 preceptúa que:

*(A) El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes.*
*(B) La obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en el asunto en controversia.*
*(C) Para establecer un hecho, no se exige aquel grado de*

---

[17] *Id.*, pág. 772.
[18] 32 LPRA Ap. V, R. 42.2.
[19] *S.L.G. Rivera Carrasquillo v. A.A.A.*, *supra*, pág. 356.
[20] *Rivera Menéndez v. Action Service*, 185 DPR 431, 444 (2012).
[21] Regla 19 (A) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 19 (A). Véanse, además, Reglas 19 (B), 20, 76 (A) y (E).
[22] 32 LPRA, Ap. VI, R. 110.

*prueba que, excluyendo posibilidad de error, produzca absoluta certeza.*
(D) *La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho[.]*
(E) *[...]*
(F) *En los casos civiles, la decisión de la juzgadora o el juzgador se hará mediante la preponderancia de la prueba a base de criterios de probabilidad[.]*[23]

En otras palabras, le corresponde al tribunal determinar si la prueba desfilada es suficiente para establecer la veracidad de los hechos alegados.[24] Así las cosas, no basta con formular meras alegaciones o teorías, pues ello, no constituyen prueba.[25]

Respecto al valor probatorio que les otorgarán los tribunales a los testimonios periciales, la Regla 702 de Evidencia señala que:

*[e]l valor probatorio del testimonio dependerá, entre otros, de:*
(A) *si el testimonio está basado en hecho o información suficiente;*
(B) *si el testimonio es el producto de principios y métodos confiables;*
(C) *si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;*
(D) *si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;*
(E) *las calificaciones o credenciales de la persona testigo, y*
(F) *la parcialidad de la persona testigo.*[26]

La citada Regla 702 establece una serie de factores que inciden sobre el valor probatorio del testimonio pericial, cuyo fin último es ayudar al juzgador, a entender determinada prueba o hecho en controversia.[27]

De modo, que: *"el juzgador de hechos no está obligado a aceptar las conclusiones de un perito. Por lo tanto, si luego de aquilatar el testimonio pericial, el juzgador concluye que no merece credibilidad, este tiene la facultad de rechazarlo".*[28]

**C.**

En materia de responsabilidad civil extracontractual, quien por acción u omisión cause daño a otro, interviniendo cualquier

---

[23] *Ibid.*
[24] *Belk v. Martínez,* 146 DPR 215, 231 (1998).
[25] *U.P.R. v. Hernández,* 184 DPR 1001, 1013 (2012); *Pereira Suárez v. Jta. Dir. Cond.,* 182 DPR 485, 510 (2011).
[26] 32 LPRA, Ap. VI, R. 702.
[27] E. Rivera García, *El valor del testimonio pericial en los procesos judiciales,* 47 Rev. Jur. U. Inter. P.R. 87, 99-100 (2013).
[28] *Id.,* pág. 101.

género de culpa o negligencia, vendrá obligado a reparar el daño ocasionado.[29] Esta doctrina reconoce que toda acción sobre responsabilidad por daños y perjuicios procede únicamente si concurren los siguientes elementos: **(1)** una acción u omisión culposa o negligente; **(2)** la producción de un daño real; **(3)** un nexo causal entre el daño y la conducta culposa o negligente.[30]

Conforme dispone nuestro estado de derecho vigente, la culpa o la negligencia consiste en la falta de cuidado al no anticipar o prever las consecuencias de un acto, tal y como lo haría una persona prudente y razonable en iguales circunstancias.[31] De ese modo, la exigencia de la normativa requiere que la actuación se emplee con un grado de cuidado, diligencia, vigilancia y debida precaución.[32] De ahí a que la previsibilidad sea parte fundamental de la responsabilidad por culpa o negligencia.[33] El grado de previsibilidad en cada caso varía y dependerá del estándar de conducta que sea aplicable.[34]

Respecto a qué constituye un resultado razonablemente previsible, el Tribunal Supremo de Puerto Rico ha sostenido que *"[e]l deber de previsión no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad...sino a aquél que llevaría a una persona prudente a anticiparlo".[35]* Cuando el alegado daño es causado por la omisión, existe la obligación de demostrar que el causante del presunto daño tenía el deber jurídico de actuar, y que, de no haberse incumplido, el agravio ocurrido se hubiese podido evitar.[36]

---

[29] Art. 1802 del Código Civil de Puerto Rico, 31 LPRA sec. 5141. Cabe señalar que conforme a los hechos de este caso, son de aplicación las disposiciones del derogado *Código Civil de Puerto Rico de 1930.*
[30] *Id.*; *Nieves Díaz v. González Massas,* 178 DPR 820, 843 (2010).
[31] *Nieves Díaz v. González Massas,* pág. 844.
[32] *Monllor v. Soc. de Gananciales*, 138 DPR 600, 604 (1995).
[33] *Colón Chévere v. Class Otero*, 196 DPR 855, 864 (2016); *Elba ABM v. UPR*, 125 DPR 294, 309 (1990).
[34] *Colón Chévere v. Class Otero,* supra; *Hernández v. Televicentro*, 168 DPR 803, 831 (2006).
[35] *Hernández v. La Capital*, 81 DPR 1031, 1038 (1960).
[36] *Soc. de Gananciales v. G. Padín Co., Inc.*, 117 DPR 94, 105-106 (1986).

El otro factor que debe considerarse ante la adjudicación de responsabilidad civil extracontractual es la existencia de un nexo causal entre el acto culposo o negligente y el daño sufrido. En reiteradas ocasiones, se ha establecido que solo se han de resarcir aquellos agravios que surgen como consecuencia del hecho que los ocasionó.[37] A tales efectos, en nuestro ordenamiento jurídico se acogió la doctrina de la causa adecuada.[38] La misma postula que *"[n]o es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general".[39]*

Por otro lado, debemos señalar la doctrina de negligencia comparada como elemento que puede atenuar o minimizar la responsabilidad del causante de un daño,[40] de acuerdo con el grado de negligencia desplegado por la parte perjudicada que contribuye a la producción de sus propios daños.[41] Es decir, la imprudencia concurrente del perjudicado no exime de responsabilidad total al demandado causante del daño, sino que solo reduce la misma.[42]

En casos donde se invoque la aplicación de la doctrina de negligencia comparada, el tribunal viene obligado a *"individualizar las indemnizaciones por daños, colocando el rigor económico en las partes conforme a la proporción de su descuido o negligencia".[43]* De manera que el juzgador debe determinar el monto de la compensación y el porciento de responsabilidad que corresponde a cada parte, restando de la compensación total la fracción de

---

[37] *Estremera v. Inmobiliaria Rac. Inc.*, 109 DPR 852, 856 (1980).

[38] *Jiménez v. Pelegrina Espinet*, 112 DPR 700, 705 (1982).

[39] *Nieves Díaz v. González Massas*, supra, pág. 844; *López v. Porrata Doria,* 169 DPR 135, 151-152 (2006); *Jiménez v. Pelegrina Espinet*, supra.

[40] *SLG Colón-Rivas v. ELA*, 196 DPR 855 (2016); Art. 1802 del Código Civil derogado, 31 LPRA sec. 5141.

[41] *Colón Santos v. Coop. Seg. Múlt. P.R.,* 173 DPR 170 (2008); *Quiñones López v. Manzano Pozas,* 141 DPR 139 (1996).

[42] *Colón Santos v. Coop. Seg. Múlt. P.R.,* supra, pág. 178.

[43] H.M. Brau Del Toro, *Los Daños y Perjuicios Extracontractuales en Puerto Rico*, San Juan, Publicaciones JTS, Inc., 1986, vol. I, pág. 410, citado con aprobación en *Colón Santos v. Coop. Seg. Múlt. P.R.,* supra.

responsabilidad correspondiente a la parte demandante.[44] Para ello, es necesario analizar y considerar todos los hechos y circunstancias que mediaron en el caso, y particularmente si ha habido una causa predominante.[45]

**D.**

Sabido es que los establecimientos comerciales están obligados a tomar las medidas necesarias para que las áreas abiertas al público sean razonablemente seguras.[46] Es decir, *"el dueño u operador debe ejercer un cuidado razonable para mantener la seguridad de las áreas accesibles al público, para que, de ese modo, se evite que sus clientes sufran algún daño"*.[47] Este deber incluye la obligación de anticipar, así como la de evitar, que ocurran daños en el establecimiento.[48]

No obstante, el dueño de un establecimiento comercial no tiene responsabilidad absoluta sobre cualquier tipo de daño sufrido por sus clientes.[49] De manera que, para poderle imponer responsabilidad, el demandante tiene que demostrar que el dueño del establecimiento comercial incurrió en un acto u omisión negligente que causó o contribuyó a los daños sufridos por el perjudicado.[50] En ese sentido, se ha resuelto que los dueños de establecimientos comerciales responden por los daños ocasionados como consecuencia de condiciones peligrosas existentes, siempre que éstas sean conocidas por los propietarios o su conocimiento le sea imputable.[51] Es decir, le corresponde al demandante probar que: **(1)** el daño sufrido se debió a la existencia de una condición peligrosa; **(2)** dicha condición fue la que con mayor probabilidad

---

[44] *Colón Santos v. Coop. Seg. Múlt. P.R.,* supra, pág. 178.
[45] *SLG Colón-Rivas v. ELA,* supra, págs. 865-866.
[46] *Santiago v. Sup. Grande,* 166 DPR 796 806 (2006).
[47] *Colón González v. K-Mart,* 154 DPR 510, 518 (2001).
[48] *Colón García v. Toys "R" Us,* 139 DPR 469, 473 (1995).
[49] *Santiago v. Sup. Grande,* supra, pág. 807.
[50] *Ibid.*
[51] *Colón González v. K-Mart,* supra, págs. 518-519.

ocasionó el daño y; **(3)** que la misma era conocida por el demandado o, debió conocerla.[52]

## E.

La valoración del daño constituye un elemento fundamental en nuestro ordenamiento jurídico.[53] El concepto daño comprende tanto pérdidas patrimoniales como no patrimoniales. Los daños patrimoniales incluyen el valor de la pérdida sufrida y la ganancia dejada de obtener por un acreedor.[54] Entre los daños no patrimoniales, están comprendidos los daños físicos y las angustias mentales. Se consideran angustias mentales indemnizables aquellos daños de carácter emocional, tales como estados de pesar, sufrimiento, angustia, dolor y ansiedad causalmente relacionados con un acto culposo o negligente.[55] Para que una reclamación de este tipo proceda, es imprescindible probar sufrimientos y angustias morales profundas y no bastaría una pena pasajera como base de la acción.[56]

El proceso de valorar los daños es uno de los ejercicios de la función judicial más complejos, puesto que implica adjudicar un valor monetario a un daño que solamente puede ser aprehendido en toda su extensión por quien lo sufre. Las prácticas judiciales reiteradas dan un marco de referencia adecuado para que los tribunales puedan hacer dicha gestión estimatoria con alguna uniformidad.[57] No obstante, como no existen casos exactamente iguales y cada uno depende de sus propias circunstancias al momento de valorizar los daños, está implícito un ejercicio de discreción guiado por el sentido de justicia del juzgador.[58] La tarea

---

[52] *Ibid.*
[53] A. J. Amadeo-Murga, *El Valor de los Daños en la Responsabilidad Civil*, 2da Ed., Bosh Editor, 2012, pág. 19.
[54] Art. 1059 del Código Civil Derogado, 31 LPRA sec. 3023.
[55] *Elba A.B.M. v. U.P.R.*, 125 DPR 294 (1990).
[56] *Ramos Rivera v. E.L.A.*, 90 DPR 828 (1964).
[57] *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, 179 DPR 774 (2010).
[58] *Rodríguez et al. v. Hospital et al.*, 186 DPR 889 (2012).

de valorar el daño lleva consigo cierto grado de especulación e involucra elementos subjetivos del juzgador, tales como la discreción y el sentido de justicia y conciencia humana.[59]

Ahora bien, son los jueces de instancia los que están en mejor posición que los tribunales apelativos para hacer esta evaluación, toda vez que estos son los que tienen contacto directo con la prueba presentada.[60] Por ello, los foros revisores guardaremos deferencia a las valorizaciones de daños que hagan los foros de primera instancia.[61] De esta forma, los tribunales apelativos no habremos de intervenir con la valoración de daños que realiza el foro primario, salvo cuando la cuantía concedida resulte ridículamente baja o exageradamente alta.[62] En este último caso, estamos obligados a examinar la prueba desfilada ante el foro primario y las cuantías otorgadas en casos similares resueltos anteriormente.[63] Ciertamente, las indemnizaciones concedidas en casos anteriores constituyen un punto de partida y referencia útil para pasar juicio sobre las concesiones otorgadas por el foro primario; aun cuando no existen dos casos exactamente iguales y cada uno es distinguible según sus circunstancias particulares.[64] En todo caso, las compensaciones otorgadas en casos anteriores deben ajustarse a su valor presente; a ese fin, se ha dispuesto:

> *Ante ello, nos vemos obligados a advertir a los jueces y las juezas sobre la importancia de detallar en sus dictámenes los casos que se utilicen como referencia o punto de partida para la estimación y valoración de daños y el cómputo realizado para establecer las cuantías que se concedan. Este llamado a los jueces y las juezas cobra importancia ante la necesidad imperante de instruir a las partes y a los miembros de la profesión jurídica en torno al método que se utiliza en ese difícil y angustioso proceso de estimar y valorar los daños. Habida cuenta de que esa tarea lleva consigo cierto grado de especulación, **es forzoso explicar qué casos se utilizan como referencia y cómo las cuantías concedidas se***

---

[59] *Santiago Montañez, et al. v. Fresenius Medical Care, et al.,* 195 DPR 476 (2016).
[60] *Herrera, Rivera v. S.L.G. Ramírez-Vicéns,* supra.
[61] *Santiago Montañez, et al. v. Fresenius Medical Care, et al.,* supra.
[62] *Ibid.*
[63] *Id.*
[64] *Rodríguez et al. v. Hospital et al.,* supra, págs. 909-910; *Herrera, Rivera v. S.L.G. Ramírez-Vicéns,* supra, pág. 785.

*ajustan en esos casos anteriores al caso que el tribunal tiene ante su consideración.*[65]

Claro está, quien solicite modificar la cuantía concedida tendrá el peso de la prueba.[66] De este modo, la parte que solicita la modificación de la indemnización concedida por el foro primario **deberá** demostrar que en efecto existen circunstancias que así lo justifican.[67] Sin embargo, a pesar de que la tarea de valoración de daños puede generar múltiples criterios, tal tarea debe residir, dentro de lo posible, en el juicio del juzgador de los hechos, enmarcado dentro de un análisis de razonabilidad. De no existir algún error manifiesto, parcialidad o prejuicio en tal apreciación, no corresponde nuestra intervención.[68]

**F.**

La Regla 44.1 de Procedimiento Civil,[69] establece lo relativo a las costas y honorarios de abogados. En lo que respecta a las costas, estas tienen una función reparadora, debido a que permite el reembolso de los gastos necesarios y razonables que tuvo que incurrir la parte victoriosa en la tramitación del pleito en el TPI.[70] En específico, el inciso (a) de la referida Regla 44.1, dispone lo siguiente:

> *(a) Su concesión: Las costas le serán concedidas **a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación o revisión**, excepto en aquellos casos en que se disponga lo contrario por ley o por estas reglas. Las costas que podrá conceder el tribunal son los **gastos incurridos necesariamente en la tramitación de un pleito o procedimiento que la ley ordena o que el tribunal, en su discreción, estima que una parte litigante debe reembolsar a otra.*[71]

---

[65] *Santiago Montañez, et al. v. Fresenius Medical Care, et al.,* supra, pág. 493. (Énfasis nuestro).
[66] *Meléndez Vega v. El Vocero de PR*, 189 DPR 123 (2013).
[67] *Ibid.*
[68] *Ibid.*
[69] 32 LPRA Ap. V, R. 44.1.
[70] *Rosario Domínguez v. ELA*, 198 DPR 197, 211–212 (2017).
[71] Regla 44.1 (a) de Procedimiento Civil, 32 LPRA. Ap. V, R. 44.1(a). (Énfasis provisto).

Es decir, el derecho de la parte prevaleciente no queda menguado por los gastos que tuvo que incurrir sin su culpa y por culpa del adversario.[72] Así, en Puerto Rico rige la doctrina de la imposición mandatoria de costas a la **parte vencida**.[73] Claro está, el tribunal tiene discreción de evaluar la razonabilidad y necesidad de los gastos detallados.[74] "*Esta discreción se ejercerá con moderación, y se examinará cuidadosamente el memorando de costas en cada caso*".[75] Lo anterior, debido a que no todos los gastos ocasionados por el pleito son costas.[76] Asimismo, no todos los gastos que se incurren durante la tramitación de un litigio se reconocen como recobrables.[77] Para fines de la Regla 44.1 (a), *supra*, son recobrables aquellos gastos incurridos necesariamente en la tramitación del pleito.[78] Quedan excluidos aquellos gastos innecesarios, superfluos o extravagantes.

El tribunal tiene amplia discreción para evaluar la razonabilidad y necesidad de los gastos detallados.[79] Los tribunales revisores no intervendrán con la discreción del TPI, a menos que se demuestre que dicho foro cometió un abuso de discreción.[80]

Por otro lado, en cuanto a los peritos, la concesión de costas opera por vía de excepción y solo se pueden otorgar cuando ello esté plenamente justificado.[81] Los gastos incurridos en peritos estarán justificados cuando se demuestre que el testimonio pericial presentado era necesario para que prevaleciera la teoría de la parte

---

[72] *Rosario Domínguez v. ELA, supra,*
[73] *Colondres Vélez v. Bayrón Vélez*, 114 DPR 833, 839 (1983).
[74] *Maderas Tratadas v. Sun. Alliance et al.*, 185 DPR 880, 935 (2012).
[75] *Semidey Ramos v. Farmacia Belmonte*, 211 DPR 222, 237, (Sentencia).
[76] *Andino Nieves v. AAA*, 123 DPR 712, 716 (1989); *Garriga, Jr. v. Tribunal Superior*, 88 DPR 245, 252 (1963). Las costas son aquellos gastos razonables que sean causa inmediata o directa del pleito. R. Hernández Colón, *Práctica jurídica de Puerto Rico: Derecho procesal civil*, 6ta ed., San Juan: Lexis Nexis, 2017, pág. 427.
[77] *Comisionado v. Presidenta*, 166 DPR 513, 518 (2005); *Garriga, Jr. v. Tribunal Superior, supra*, 256-257.
[78] *JTP Development Corp. v. Majestic Realty Corp.*, 130 DPR 456, 460 (1992).
[79] *Maderas Tratadas v. Sun Alliance et al., supra.*
[80] *Andino Nieves v. A.A.A.*, 123 DPR 712, 719 (1989).
[81] *Maderas Tratadas v. Sun Alliance et al.*, supra.

vencedora.[82] Esto implica que el tribunal deberá evaluar la importancia y utilidad del testimonio y descartar las costas reclamadas por prueba irrelevante, inmaterial o innecesaria.[83]

Por su parte, el inciso (b) de la precitada Regla 44.1, establece cómo se concederán las costas una vez se soliciten ante el TPI. En ese sentido, dispone el término y la forma que debe cumplir la parte victoriosa. De igual forma, indica el proceso de impugnación de la petición de costa por la parte que resultó vencida.

Asimismo, la Regla 44.1 de Procedimiento Civil faculta a los tribunales a imponer el pago de una cuantía por concepto de honorarios de abogado en casos donde cualquiera de las partes o sus abogados hayan procedido con temeridad o frivolidad.[84] A falta de una definición de lo que constituye *"temeridad"*, el Tribunal Supremo ha dispuesto que *"[l]a temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia"*.[85]

En nuestro ordenamiento dicho concepto es amplio, sin embargo, nuestro más Alto Foro ha señalado, a modo de ejemplo, que constituye temeridad *"[n]egar un hecho que le consta es cierto al que hace la alegación"*.[86] El propósito de este mecanismo es penalizar al que con su conducta ha obligado a la parte adversa en un litigio a incurrir en gastos.[87] Los honorarios por temeridad se imponen como *"[p]enalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajos e*

---

[82] *Id.*
[83] *Id.*
[84] 32 LPRA Ap. V, R. 44.1.
[85] *Jarra Corp. v. Axxis Corp.*, 155 DPR 764, 779 (2001).
[86] *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 212 (2013); *P.R. Oil v. Dayco*, 164 DPR 486, 511 (2005).
[87] *S.L.G. Flores-Jiménez v. Colberg*, 173 DPR 843, 866 (2008).

*inconveniencias de un pleito*".[88]

La imposición de honorarios por temeridad descansa en la sana discreción de los tribunales.[89] Por tanto, una vez un tribunal de primera instancia determina que hubo temeridad, la imposición de honorarios es mandatoria.[90] De modo, que: *"[p]or ser la determinación de temeridad de índole discrecional, solo debemos de intervenir con ella cuando nos enfrentemos a un caso de abuso de discreción"*.[91]

**-III-**

A la luz de la normativa jurídica antes expuesta, procedemos a evaluar los errores señalados en los recursos ante nuestra consideración.

**A.**

En el recurso identificado como **KLAN202300536** Apelantes-Demandados hacen tres (3) señalamientos de error, que se resumen, en cuestionar la apreciación del foro primario sobre la prueba presentada en el juicio. Además, como cuarto y último error, objetan que se incluyera la doctrina de expoliación en su dictamen, en alegada abstracción de los pronunciamientos del Tribunal Supremo de Puerto Rico en torno a dicha doctrina. No les asiste la razón. Veamos.

En **primer orden**, los Apelantes-Demandados alegan que el foro primario formuló determinaciones de hechos que no encuentran apoyo en la prueba desfilada en el juicio. En específico, arguyen que las determinaciones de hechos número 7, 13, 14, 17, 18, 19, 20, 21, 22 y 26 no encuentran apoyo en la prueba desfilada en el juicio y deben ser enmendadas y algunas eliminadas.

---

[88] *Andamios de PR v. Newport Bonding*, 179 DPR 503, 520 (2010).
[89] *Torres Montalvo v. García Padilla*, 194 DPR 760, 790 (2016).
[90] *Meléndez Vega v. El Vocero de PR*, supra, pág. 211.
[91] *Andamios de PR v. Newport Bonding*, supra, pág. 546.

Bien, comencemos con la determinación de hechos **número 7** indica lo siguiente:

> **7.** Cuando ocurrió el Accidente, Carmona no estaba en el área de restaurante de la Tienda, sino en su oficina, por lo cual no vio la caída, pero cuando le avisaron salió y observó que acababan de pasar mapo en el área de los condimentos. *Testimonio de Edmee Carmona*".

Los Apelantes-Demandados aseveran que está incompleta y que debió incluirse que la Sra. Edmee Carmona Carmona (en adelante, "señora Carmona"),[92] entonces asistente de gerente del restaurante Wendy's, observó que lo que se limpiaba del piso eran los mismos alimentos y el refresco que derramó la señora Ortiz Vizcarrondo cuando se cayó.

Hemos revisado cuidadosamente la transcripción de la prueba oral estipulada, con particular detenimiento en el testimonio de la señora Carmona y el testimonio de la perjudicada, señora Ortiz Vizcarrondo, y no se desprende que la determinación de hechos **núm. 7** esté incompleta o que sea necesaria enmendarla.

De entrada, indicamos que en la determinación de hechos **núm. 2** se consignó que la caída de la señora Ortiz Vizcarrondo provocó que los alimentos y el refresco se derramaran en el suelo. Es decir, el foro primario reconoció en su dictamen que la caída provocó un derrame de alimentos y bebidas gaseosas.

Reiterado lo anterior, de la transcripción de la prueba oral estipulada surge que la señora Carmona admitió que al momento de la caída se encontraba en su oficina y no recordaba quién le avisó de la caída.[93] Asimismo, aceptó que cuando observó el área de la caída acababan de pasar mapo.[94] Lo anterior, no está reñido con

---

[92] Resulta menester señalar que la señora Carmona primero testificó como testigo adverso de los Apelados-Demandantes y, subsecuentemente, declaró como testigo de los Apelantes-Demandados.

[93] Transcripción de la prueba oral estipulada (en adelante, "TPOE"), pág. 59, líneas 3-8.

[94] *Ibid.*, líneas 13-19.

que el hecho de que a raíz de la caída el piso estuviera mojado y con alimentos que fueron subsecuentemente limpiados.

En ese sentido, la señora Carmona reconoció que el Sr. Javier Rodríguez López (en adelante, "señor Rodríguez López"), empleado del restaurante, era quien había pasado mapo.[95] Cuando llegó al área donde estaba la perjudicada, aseveró que no recordaba dónde estaba dicho empleado.[96] A pesar de lo anterior, expresó que cuando salió de la oficina para atender el asunto de la caída, el señor Rodríguez López limpiaba bandejas al lado de la caja.[97] Luego, a preguntas del abogado de los Apelantes-Demandados, la señora Carmona afirmó que dicho empleado estaba limpiando lo que se le derramó a la perjudicada cuando se cayó.[98] No obstante, esto no quiere decir que **antes** de la caída no hubiera una condición peligrosa en el piso del restaurante o, cuando único se pasó mapo en el restaurante fue **después** de la caída que originó el pleito de autos.

La señora Carmona expresó que la perjudicada le dijo que: *"ella se cayó o **resbaló** y cayó encima de una mano. Cuando ella se cae se aguantó del piso de esa mano"*.[99] Admitió que en el área de los condimentos —donde ocurrió el incidente— el señor Rodríguez López le estaba dando mantenimiento.[100] Asimismo, testificó que escribió en el Aviso de Incidente expresamente lo que le dijo la señora Ortiz Vizcarrondo: *"[a]parentemente **el empleado del salón pasó el mapo en el área de condimentos. Clienta pasó aparentemente a surtirse de dichos condimentos y esta aparentemente resbaló** golpeándose en el área derecha del*

---

[95] TPOE, pág 59, líneas 20-22.
[96] *Ibid.*, líneas 23-25.
[97] *Id.*, pág. 424, líneas 20-22.
[98] *Id.*, pág. 425, líneas 1-4.
[99] *Id.*, pág. 420, líneas 1-2.
[100] *Id.*, pág. 62, líneas 15-20.

*cuerpo...".*[101] Reiteró que cuando llegó al área de los condimentos **acababan de pasar el mapo**.[102]

A todas luces, la determinación de hechos **núm. 7** no es incorrecta. Tampoco está incompleta ni necesita ser enmendada. El testimonio de la señora Carmona revela precisamente lo que consignó el TPI. Entiéndase, que al momento del incidente estaba en su oficina, no vio la caída y luego se percató que en el área de la caída habían mapeado, tal como determinó el foro primario. Ello no está reñido con que después el mismo empleado limpiara los alimentos y bebidas que se derramaron cuando la perjudicada se cayó. Por consiguiente, resulta innecesaria e improcedente la enmienda sugerida por los Apelantes-Demandados.

Pasemos a la determinación de hechos **número 13**, en la que el TPI estableció lo siguiente:

> **13.** El proceso establecido por WENDCO es que la gerente de la tienda prepara y notifica un Aviso de Incidente a las oficinas centrales, donde la Sra. Ana Alcántara lo recibe y remite a los corredores de seguros de la empresa. *Testimonio Ana Alcántara Moya.* No suele llevar a cabo trámite para preservar evidencia de vídeo. *Id.*

Los Apelantes-Demandados alegan que esta determinación de hechos está incorrecta y debe enmendarse para incluir lo declarado por la Sra. Alcántara Moya (en adelante, "la señora Alcántara Moya"), en relación con el trámite que realizó para preservar evidencia en video. La señora Alcántara Moya declaró que es auxiliar de contabilidad y, al momento de la vista, trabajaba desde hacía 19 años con la empresa demandada.[103] Entre sus funciones de trabajo recibe informes de accidentes que ocurren en los restaurantes.[104] En específico, explicó que recibió el informe del incidente que se preparó en el restaurante, y lo envió a través del correo electrónico al bróker de la compañía para que fuera procesado en la

---

[101] TPOE, pág. 63, líneas 1-6 y pág. 433, líneas 9-16.
[102] *Id.*, pág. 64, líneas 23-25 y pág. 65, línea 1.
[103] *Id.*, pág. 15, línea 3-6.
[104] *Id.*, pág. 17, líneas 2-5.

aseguradora.[105] Lo anterior fue precisamente lo que expuso el foro primario.

En relación al caso de autos, declaró que recibió por *e-mail* un aviso de incidente.[106] Expresó que solicitó los videos a ABC Security Company (en adelante, "compañía de seguridad ABC"), quien provee el servicio de cámaras de seguridad; no obstante, **normalmente son supinas que les lleva la Policía**.[107] **En casos de incidentes que ocurren en los restaurantes no solicita copia del video**.[108] Es decir, en casos de accidentes, por lo general la señora Alcántara Mora no realiza trámites para solicitar o preservar copias de videos. Eso fue lo que determinó el foro primario.[109] Por consiguiente, <u>no</u> encontramos que la determinación de hechos **núm. 13** sea incorrecta y deba ser alterada.

En cuanto a la determinación de hechos **número 14**, los Apelantes-Demandados aducen que debe eliminarse por constituir una valoración subjetiva y no un hecho susceptible de determinarse en atención a la prueba desfilada. Tampoco le asiste la razón.

La determinación de hechos **núm. 14** expresa lo siguiente:

**14.** El relato del Accidente y de la reacción de la Demandante en el Aviso de Incidente describe un incidente los suficientemente serio para que la Demandada razonablemente anticipara una reclamación en su contra. *Exhibit 1 de los Demandantes*. Sin embargo, la Demandada no tomó medidas en ese momento para preservar las imágenes de las cámaras de seguridad de la Tienda. *Testimonio Ana Alcántara Moya*.

Como señaláramos previamente, la señora Carmona declaró que en el aviso de incidente escribió lo que le expresó la señora Ortiz Vizcarrondo.[110] Reconoció su letra y firma.[111] Admitió que apuntó la

---

[105] TPOE, pág. 17, líneas 17-21.
[106] *Id.*, pág. 18, líneas 1-3 y 23-25.
[107] *Id.*, a la pág. 19, líneas 20-23.
[108] *Ibid.*, líneas 24 -25 y pág. 20, línea 1.
[109] La expresión "no suele" significa que no es frecuente o usual.  De acuerdo con el Diccionario de la Real Academia Española "soler" significa:
Soler 1. intr. Dicho de un ser vivo: Tener costumbre.
sin.: acostumbrar, frecuentar, habituarse.
2. intr. Dicho de un hecho o de una cosa: Ser frecuente.
https://dle.rae.es/soler (última búsqueda 15 de marzo de 2024).
[110] Véase, nota al calce núm. 85.
[111] TPOE, pág. 61, líneas 20-23.

fecha y hora cuando hizo el aviso: **18 de septiembre de 2019, aproximadamente a la 1:20 pm**.[112] También anotó que el incidente ocurrió en el área de condimentos y que el señor Rodríguez López estaba dándole mantenimiento a esa área.[113] Luego, leyó en voz alta lo que escribió en cuanto a cómo ocurrió el incidente: *"[a]parentemente, el empleado del salón pasó el mapo en el área de condimentos, cliente pasó a surtirse de dichos condimentos y esta aparentemente resbaló, golpeándose en el área derecha del cuerpo. Esta alega se aguantó con su mano del piso, el cual alega que sufre dolor, dolor, dolor (sic) en ella"*.[114]

En cuanto a las lesiones, en el aviso de incidente la señora Carmona escribió que la perjudicada *"[a]legadamente se golpeó en el área derecha del cuerpo incluyendo su mano derecha hasta el hombro"*. Asimismo, en el acápite de los comentarios del aviso, anotó que la *"cliente alega que le duele todo el cuerpo en la parte derecha y su muñeca hasta el hombro"*.

Por su parte, al explicar cómo ocurrió la caída, la señora Ortiz Vizcarrondo declaró lo siguiente:

> ...cuando me dieron mi orden, voy a la mesa de los condimentos, me sirvo los condimentos, como uno acostumbra a hacer, cogí la, el refresco y la comida, que me la echaron en una bolsa. Luego que terminé de hacer, de echarme los condimentos, di media vuelta, di aproximadamente varios pasos, y me resbalé. **Me caí con todo el peso, sobre mi lado derecho, me lastimé el cuello, el hombro, el brazo, la cadera, el tobillo, todo el lado derecho porque el cuerpo se cayó, literalmente todo el peso, cayó sobre ese lado derecho. Nunca había experimentado una caída, lo que no me pude, no me pude incorporar por mí misma. Traté, pero no pude incorporarme con mi mismo. Vino una persona que estaba allí comiendo y me ayudó, me tuvo que ayudar a incorporarme porque no pude.**[115] (Énfasis provisto).

---

[112] TPOE, pág. 62, líneas 11-14.
[113] *Ibid.*, líneas 15-20.
[114] *Id.*, pág. 63, líneas 1-6. Véase, además, Aviso de Incidente, Exhibit 1 de los Demandantes-Apelados, *Oposición a Apelación*, pág. 6.
[115] TPOE, pág. 145, líneas 6-21.

Además, expresó que luego de la caída sentía *"un fuerte dolor en el hombro, en la muñeca, en la cadera, en la pierna, en el tobillo, en el brazo, todo el lado derecho, todo"*.[116]

Como vemos, la señora Ortiz Vizcarrondo sufrió una caída aparatosa que requirió ayuda para poder levantarse del piso, y a raíz de eso, sintió dolor en todo el lado derecho de su cuerpo. Por tal razón, no erró el foro primario cuando concluyó que era de anticiparse una reclamación en vista de la magnitud de la caída.

Asimismo, del testimonio de la señora Alcántara Moya, antes citado, se desprende —con toda claridad— que la parte Apelante-Demandada no preserva copia de los videos de las cámaras de seguridad de los restaurantes. En cuanto al caso de autos, la señora Alcántara Mora recordó que recibió una carta del representante legal de los Apelados-Demandantes en la que solicitaba los videos del incidente.[117] Recordó, además, enviarle a la compañía de seguridad ABC una solicitud para que verificaran si existían videos del incidente.[118]

Del relato anterior se desprende con meridiana claridad que no fue hasta que se recibió una carta del representante legal de los Apelados-Demandantes que se hicieron gestiones para obtener copia del video del incidente. Por consiguiente, no incidió el TPI al concluir que al momento de la caída no se tomaron medidas para preservar el video de las cámaras de seguridad de la tienda.

Prosigamos con la determinación de hechos **número 17**, en la que los Apelantes-Demandados afirman que **contradice** la determinación de hechos **número 13** previamente analizada. En específico, afirman que el foro primario dispuso en la determinación de hechos **núm. 13** que la señora Alcántara Moya *"no suele llevar a*

---

[116] TPOE, pág. 155, líneas 20-22.
[117] *Id.*, pág. 20, líneas 1-3.
[118] *Ibid.*, líneas 3-5.

*cabo <u>ningún</u> (sic) trámite para preservar evidencia de video"* y que esto **no** es cónsono con la determinación de hechos **número 17**:

> **17.** La Sra. Alcántara es la persona dentro de WENDCO a cargo de tramitar las solicitudes de imágenes de las cámaras de seguridad, lo cual hace usualmente a tenor con las órdenes que tramita la Policía de Puerto Rico como parte de sus investigaciones. Testimonio Ana Alcántara Moya. De modo que se trata de evidencia en control de la Demandada, aunque no estuviera directamente en su posesión física.

Es preciso destacar que en la determinación de **hechos núm. 13** de la Sentencia, **no figura la palabra "<u>ningún</u>"**. Desafortunadamente, dicho vocablo fue añadido por los Apelantes-Demandados en su escrito de apelación. Como expusiéramos previamente, el TPI indicó que la señora Alcántara Moya *"[n]o suele llevar a cabo trámite para preservar evidencia de vídeo"* en cuanto a incidentes que ocurran en las tiendas. Es decir, que no lo hace con frecuencia o asiduidad.

Aun cuando lo anterior es suficiente para derrotar la alegación de los Apelantes-Demandados, la señora Alcántara Moya indicó que normalmente los videos que solicita a la compañía de seguridad ABC obedecen a solicitudes de la Policía.[119] Los Apelantes-Demandados son los que le indican a la compañía de seguridad ABC, qué video deben facilitarle y, por ende, controlan su disponibilidad como concluyó el TPI. No le asiste la razón a los Apelantes-Demandados en su planteamiento.

Examinemos ahora la determinación de hechos **número 18** que los Apelantes-Demandados cuestionan:

> **18.** La Sra. Alcántara recibió la carta el 3 de octubre de 2019, y solicitó a ABC Security Company copia de las imágenes de las cámaras interiores de la Tienda del día y hora aproximada del Accidente el 4 de octubre de 2019. *Testimonio Ana Alcántara Moya.* Esta fue la primera gestión de WENDCO para conseguir las imágenes del Accidente. *Id.* Esto significa que la Demandada tardó tres días en hacer trámite alguno con relación a la notificación de reclamación y preservación de evidencia luego de recibida. ABC Security no contestó la comunicación, y WENDCO no llevó a cabo tramites adicionales para preservar las imágenes. *Id.*

---

[119] TPO, pág. 19, líneas 20-23.

A simple vista pudiese parecer contradictorio que, por un lado el TPI concluyó que la corporación demandada tardó tres (3) días en hacer algún trámite con respecto a la solicitud de evidencia fílmica de los Apelados-Demandantes, mientras que por otro, resolvió que la señora Alcántara Moya recibió la carta del abogado de los Apelados-Demandantes el 3 de octubre de 2019 y al día siguiente, el 4 de octubre de 2019, le solicitó a la compañía de seguridad ABC copia de dicha evidencia. No obstante, del testimonio de la señora Alcántara Moya se desprende que **el 1 de octubre de 2019**, el Sr. Roberto Aponte, empleado mensajero de la empresa codemandada, recogió la carta cursada mediante correo certificado.[120] Surge de la transcripción que no fue hasta el **4 de octubre de 2019**, cuando la señora Alcántara Moya le solicitó a la compañía de seguridad ABC copia de las imágenes de las cámaras del restaurante.[121] Por lo tanto, efectivamente, los Apelantes-Demandados tardaron tres (3) días en tramitar la solicitud de evidencia visual solicitada por los Apelados-Demandantes. Asimismo, la señora Alcántara Moya expresamente declaró que luego de dicha solicitud del 4 de octubre de 2019, no recibió respuesta escrita o por algún otro medio de la compañía de seguridad ABC.[122] Añadió que no recordaba si realizó algún otro trámite al respecto.[123] Luego admitió que no hizo ninguna otra gestión por escrito.[124] Visto todo lo anterior, no procede nuestra intervención con la determinación de hechos **núm. 18**.

En cuanto a la determinación de hechos **número 19**, los Apelantes-Demandados afirman que es inconsecuente e inmeritoria. Añaden que se deben eliminar las últimas dos oraciones debido a que se discute un hecho relacionado a una prueba que no se

---

[120] TPOE, pág. 35, líneas 16-19, pág.36, líneas 21-25 y pág. 37, líneas 1-3.
[121] *Id*, pág. 20, líneas 6-10, pág. 23, líneas 5-20, pág. 44, líneas 1-4.
[122] *Id.*, pág. 44, líneas 5-7, pág. 47, líneas 18-22, pág. 49, línea 18 y pág. 51, líneas 6-7.
[123] *Id.*, pág. 52, líneas 4-5.
[124] *Id.*, pág. 55, líneas 1-5.

presentó en el juicio y que tampoco fue solicitada por los Apelados-Demandantes. Además, arguyen que, al aceptar la ocurrencia de la caída, se tornaba innecesaria la producción del video e improcedente la invocación de la doctrina de expoliación de evidencia. La determinación de hechos **número 19**, expresa lo siguiente:

> **19.** La parte demandada, no cuenta con el vídeo de la caída de la Sra. Ortiz. [Estipulado, Entrada 40.] La Demandada no trajo evidencia de los protocolos de preservación de récords de su contratista. Tampoco trajo evidencia que nos permita determinar en qué fecha se destruyeron las imágenes de las cámaras de seguridad de la Tienda.

Contrario a lo aducido por los Apelantes-Demandados dicha evidencia no es impertinente o innecesaria. Aceptar que ocurrió un accidente no es lo determinante en casos de caídas en establecimientos comerciales, sino que existía en el restaurante una condición peligrosa que era de conocimiento del dueño o que su conocimiento le es imputable.

En el caso de autos, las imágenes solicitadas pudieron, efectivamente, haber demostrado si **antes** de que ocurriera la caída de la señora Ortiz Vizcarrondo existió una condición peligrosa en el piso y si la empresa demandada tenía conocimiento o debió tenerlo. De hecho, las imágenes pudieron haber demostrado que la empresa demandada siguió su protocolo de revisión de áreas en los restaurantes y no tuvo oportunidad de tomar acción en cuanto a medidas de seguridad para prevenir el accidente.

Desde antes del inicio del pleito, los Apelados-Demandantes solicitaron copia de evidencia fílmica de las cámaras de seguridad del restaurante donde ocurrió la caída de la señora Ortiz Vizcarrondo. WENDCO no hizo mayor gestión que un correo electrónico de la señora Alcántara Moya a la compañía de seguridad ABC el 4 de octubre de 2023. Por ende, los Apelantes-Demandados no preservaron las imágenes de las cámaras de seguridad que les solicitaron. Tampoco se desprende del expediente o de la

transcripción de la prueba oral estipulada las fechas en las que el video fue borrado o destruido.

Con lo anterior, los Apelantes-Demandados incumplieron la Regla 23.1(d) de Procedimiento Civil, la cual claramente establece la obligación de preservar prueba sujeta a descubrimiento.[125] El incumplimiento con preservar evidencia es lo que hace que todas las oraciones de la determinación **núm. 19** sean relevantes y no vemos razón alguna para concluir que deben eliminarse.[126]

En lo que respecta a la determinación de hecho **número 20**, los Apelantes-Demandados alegan que debe eliminarse por inconsecuente e inmeritoria. La determinación **núm. 20 expresa que** *"[e]l croquis de la tienda, facilitado por la parte demandada fue estipulado. [Estipulado, Entrada 40.]"*. Aunque las partes no hicieron referencia al croquis durante el juicio, lo cierto es que el croquis fue la estipulación núm. 6 de las partes en el *Informe de Conferencia Entre Abogados Vista Señalada para el 1 de Diciembre de 2021* y así también consta en la *Minuta* de la correspondiente Conferencia con Antelación al Juicio.[127] Por lo tanto, existe prueba suficiente en el récord para sostener la determinación del TPI. Así pues, dentro del ámbito de deferencia que debemos brindarles a las determinaciones de hecho del foro primario no vemos razón para intervenir con la determinación **número 20**.

De otra parte, los Apelantes-Demandados cuestionan *"de su faz"* la determinación de hechos **número 21** por considerarla incorrecta. Arguyen que la controversia del caso de autos no es si

---

[125] La regla 23.1(d) de Procedimiento Civil, 32 LPRA Ap. V, R. 23.1(d), taxativamente dispone lo siguiente:
Una persona **apercibida de una posible reclamación en su contra tiene la obligación de preservar prueba**. También tiene dicha obligación si existe un deber legal o ético que le exija preservar prueba, si voluntariamente asumió la obligación **o si surge de las circunstancias particulares del caso. Asimismo, una parte tiene la obligación de preservar prueba que podría estar sujeta al descubrimiento, aunque ésta no se le haya requerido**. (Énfasis provisto).
[126] Véase, Regla 34.3(d) de Procedimiento Civil, 32 LPRA Ap. V, R. 34.3(d).
[127] Véanse, *Informe de Conferencia Entre Abogados Vista Señalada para el 1 de diciembre de 2021*, Anejo 5 del Apéndice del recurso, pág. 32; *Minuta*, Anejo 6 del Apéndice del recurso de apelación KLAN202300536, pág. 59.

los empleados cumplieron con sus labores, sino la causa de la caída de la demandante. Además, que de la prueba testifical surge evidencia en torno a la colocación de un cono de seguridad, contrario a lo determinado por el TPI. No les asiste la razón.

La determinación de hechos **número 21** estableció lo siguiente:

> **21.** La norma y entrenamiento establecido por WENDCO es que la Tienda debe mantenerse limpia y ordenada. No se cierran al público las áreas donde acaban de pasar el mapo, sino que se debe colocar un cono de seguridad amarillo avisando que el piso está mojado. La gerente de turno debe hacer rondas de verificación cada una de cuatro zonas cada 15 o 30 minutos. *Testimonio de Edmee Carmona.* Sin embargo, no hubo evidencia en cuanto a si así se hizo el día del Accidente. No se mantiene bitácora de las gestiones de limpieza. *Id.* Existen documentos que describen los procedimientos de limpieza y mantenimiento, pero no se presentaron en evidencia. *Id.*

La señora Carmona declaró que recibe adiestramientos de su patrono en cuanto a mantener las áreas limpias, ordenadas y darle seguimiento cada quince (15) o treinta (30) minutos, para verificar si hay que corregir algo.[128] En cuanto a las áreas del restaurante en las que acaban de pasar mapo no se le instruyó que deben estar cerradas al público.[129] Por el contrario, cuando un empleado pasa el mapo, se coloca un cono de seguridad para indicar que el piso está mojado.[130] La señora Carmona detalló el sistema de inspección de los restaurantes y explicó que se verifican cuatro (4) zonas cada 15-30 minutos, dependiendo de las necesidades de servicio.[131] Concretamente se revisa el estacionamiento, el salón, los baños, y luego, el área de las cajeras y la línea de preparación de los alimentos.[132] Subsiguientemente se verifican los almacenes y se culmina la revisión en el área de la nevera y del congelador.[133] Añadió que a los gerentes o asistentes de gerente les corresponde

---

[128] TPOE, a la pág. 69, líneas 16-17.
[129] *Id.*, de la pág. 70, línea 24 a la pág. 71, línea 5.
[130] *Id.*, pág. 71, líneas 23-24.
[131] *Id.*, pág. 426, líneas 17-21.
[132] *Ibid.*, líneas 21-24.
[133] *Id.*, de la pág. 426, línea 24 a la pág. 427, línea 1.

hacer la revisión de las áreas.[134] Por su parte, los empleados que realizan labores de limpieza, son entrenados antes de comenzar a trabajar para que sepan identificar las áreas de oportunidad que hay en determinado momento.[135] Si está todo limpio o todo al día, se hace el *"walk through"* afuera y se le indica al empleado encargado si hace falta limpiar algo.[136]

Por último, la señora Carmona indicó que la empresa tiene documentos que muestran y enseñan los procedimientos de limpieza. Son documentos que se le entregan al empleado en el restaurante antes de que comience a trabajar e indican cómo limpiar y qué equipo utilizar.[137] Sin embargo, no tienen documentos en el restaurante para marcar que cada quince (15) minutos se mapeó el salón o se botó la basura.[138]

Como vemos, la determinación de hechos **número 21** recoge con precisión el testimonio de la señora Carmona. Habida cuenta de lo anterior, resulta menester destacar que los Apelantes-Demandados no presentaron prueba que demostrara que **antes** de la caída de la señora Ortiz Vizcarrondo se llevó a cabo el proceso de verificación de áreas del restaurante. Contrario a lo aducido por éstos, dicha información era importante para comprobar la existencia de una condición peligrosa y si el propietario o su representante tenía conocimiento de esta o su conocimiento le es imputable.

Ahora, examinemos la determinación de hechos **número 22**. Los Apelantes-Demandados aducen que hay evidencia testimonial de que **antes** de la caída de la perjudicada, el empleado encargado de limpieza, señor Rodríguez López, utilizó el cono de seguridad y lo dejó en el área de los condimentos del restaurante donde ocurrió la

---

[134] TPOE, pág. 427, líneas 5-6.
[135] *Ibid.*, líneas 10-13.
[136] *Ibid.*, líneas 16-19.
[137] *Ibid.*, líneas 23-24 y pág. 428, líneas 5-9.
[138] *Id.*, pág. 427, línea 24 a la pág. 428, línea 2.

caída. Para ello esgrimen el testimonio del señor Rodríguez López durante el juicio y la deposición de este que fue admitida como Exhibit 13 en el juicio. Afirman que, por esa razón, deben enmendarse tanto la determinación de hechos **número 21** como la determinación de hechos **número 22**.

La determinación de hechos **número 22**, expresa lo siguiente:

**22.** El día del Accidente, Javier Rodríguez colocó un cono en el área de los condimentos y pasó mapo allí. Luego pasó mapo en el centro del salón, y cuando completó esa tarea movió el cono que había colocado en el área de condimentos. *Testimonio y deposición de Javier Rodríguez.*

En su testimonio, el señor Rodríguez López afirmó que recordaba la caída de la señora Ortiz Vizcarrondo.[139] Admitió que ese día había pasado el mapo en el área de los condimentos.[140] Se le preguntó si después de mapear el área de los condimentos movió el cono amarillo hacia el centro del salón y contestó **que ya estaba puesto cuando pasó el mapo**.[141] Luego, cuando terminó de pasar el mapo en el área del medio del restaurante, se movió hacia el lado y siguió mapeando, **pero no se llevó el cono de seguridad**.[142] Cuando terminó esa área se movió hacia la parte de atrás y dijo que el cono ya estaba puesto.[143] **Explicó que primero coloca el cono de seguridad en un área y luego mapea**.[144] Clarificó que **dejó el cono de seguridad por el lado del restaurante** porque cuando fue hacia la parte de atrás del restaurante había dejado de mapear y realizó otras tareas que le asignaron.[145] El señor Rodríguez López indicó que luego lo mandaron a mapear la parte de atrás del restaurante.[146] No obstante, dijo que no colocó el cono en la parte

---

[139] TPOE, pág. 76, líneas 19-21 y pág. 77, líneas 15-17.
[140] *Id.*, a la pág. 76, líneas 22-24 y pág. 77, líneas 18-20.
[141] *Id.*, de la pág. 78, línea 21 a la pág. 79, línea 1.
[142] *Id.*, pág. 79, líneas 9-15.
[143] *Ibid.*, líneas 16-23.
[144] *Id.*, de la pág. 79, línea 24 a la pág. 80, línea 1.
[145] *Id.*, pág. 80, líneas 15-21 y pág. 81, líneas 9-17.
[146] *Id.*, pág. 81, línea 20.

de atrás.[147] Sin embargo, en el contrainterrogatorio declaró que el cono de seguridad se quedó en el área de los condimentos.

A todas luces, el testimonio del señor Rodríguez López resulta contradictorio en cuanto a la ubicación del cono de seguridad al momento de la caída de la señora Ortiz Vizcarrondo.

Las partes sometieron la deposición estipulada del señor Rodríguez López. Como explicación a la caída, expresó que cuando estaba mapeando puso el cono y la señora Ortiz Vizcarrondo no vio el cono puesto.[148] De la referida deposición surge que el señor Rodríguez López primero pasó mapo en el área de los condimentos.[149] **Luego colocó el cono de seguridad en el medio del restaurante y pasó mapo allí.**[150] Cuando terminó de mapear esa área, **el señor Rodríguez López admitió que tomó el cono de seguridad lo llevó a la parte de atrás del restaurante y se puso a mapear allí.**[151]

En relación con las funciones de limpieza del señor Rodríguez López, la señora Carmona testificó que este **coloca el cono de seguridad donde está mapeando.**[152] Admitió que si se está pasando mapo en la parte de atrás del restaurante allí va a estar el cono.[153] Al caerse la señora Ortiz Vizcarrondo, la señora Carmona salió de la oficina y le preguntó al señor Rodríguez López si había colocado el cono de seguridad en el piso. Dijo que este le contestó en la afirmativa.[154] En cuanto a cómo le constaba si el señor Rodríguez López colocó el cono de seguridad en el piso, la señora Carmona relató que el señor Rodríguez López llevaba más de diez (10) años de

---

[147] TPOE, de la pág. 81, línea 24 a la pág. 82, línea 1.
[148] Transcripción de la deposición del señor Rodríguez López, pág. 5, líneas 7-10, Anejo 4 del apéndice del recurso KLAN202300536, pág. 18.
[149] *Ibid.*, pág. 5, líneas 18-19.
[150] *Ibid.*, líneas 20-21, 24-25 y pág. 6, líneas 1-5.
[151] *Id.*, pág. 6, líneas 6-10.
[152] TPOE, de la pág. 437, línea 25 a la pág. 438, línea 1.
[153] *Id.*, pág. 438, líneas 3-5.
[154] *Id.*, pág. 423, líneas 1-6.

trabajo en la empresa, es un empleado excelente y seguía las instrucciones, según se le indican.[155]

Examinado la totalidad del testimonio del señor Rodríguez López y según corroborado por la señora Carmona, coincidimos con el foro primario en cuanto a que el señor Rodríguez López coloca el cono de seguridad en el área donde pasa el mapo, y según pasa el mapo por diferentes áreas del restaurante, mueve el cono de seguridad. Por consiguiente, el TPI razonablemente concluyó que el día de la caída, cuando terminó de pasar el mapo en el área de condimentos, el señor Rodríguez López movió el cono de seguridad de esa área. La determinación de hechos **núm. 22** no necesita enmienda y declinamos intervenir con lo colegido por el foro primario.

Por último, examinemos la determinación de hechos **número 26**. Los Apelantes-Demandados alegan que el TPI estuvo parcializado y prejuiciado al redactarla. Arguyen como fundamento la diferencia en la cantidad del número de líneas redactadas en torno a las cualificaciones de los peritos de las partes.

En lo pertinente, la determinación de hechos **número 26** establece lo siguiente:

> **26.** [...]
>
>> a. La Dra. López fue calificada como perito. Es fisiatra con más de 40 años de experiencia, y certificaciones de la American Board of Physical Medicine and Rehabilitation y la Junta de Licenciamiento y Disciplinas Medicas de Puerto Rico. Ejerce en tres hospitales del sistema de la Universidad de Puerto Rico, y se ha desempeñado como profesora del Recinto de Ciencias Médicas de la Universidad de Puerto Rico desde 1993. Es catedrática de esa institución desde el año 2007 y dirige programas de residencia en fisiatría desde 1989. Figura como coautora en diez publicaciones.
>>
>> b. El Dr. Héctor Cortés Santos fue calificado como perito. Es fisiatra certificado por American Board of Physical Medicine and Rehabilitation. Practica desde varios centros de rehabilitación y hospitales a través de Puerto Rico.

---

[155] TPOE, pág. 424, líneas 1-17.

Hemos revisado los *Curriculum Vitae* de ambos peritos y <u>no encontramos causa alguna para intervenir en la determinación de hechos **número 26**</u>. La perito de los Apelados-Demandantes, la Dra. Carmen López Acevedo (en adelante, "doctora López Acevedo"), tiene un *Curriculum Vitae* de 32 páginas, mientras que el *Curriculum Vitae* del perito de los Apelantes-Demandados, Dr. Héctor Cortés Santos (en adelante, "doctor Cortés Santos"), tiene siete (7) páginas. Además, la doctora López Acevedo practica la medicina hace más de cuarenta (40) años, es profesora de la Escuela de Medicina de la Universidad de Puerto Rico, ha publicado varios artículos de revistas médicas, realiza investigaciones con los estudiantes en el área musculo-esqueletal, dirige el programa de residencia de fisiatría y atiende pacientes en el hospital oncológico.[156] Incluso fue profesora del doctor Cortés Santos.[157]  El análisis en torno a las cualificaciones de quienes han de prestar testimonio pericial es parte inherente del ejercicio discrecional del TPI al momento de apreciar la prueba desfilada. No resulta parcializado o prejuiciado establecer las diferencias existentes entre la experiencia y trayectoria profesional de los peritos, por lo cual, no intervendremos.

En **segundo orden**, los Apelantes-Demandados arguyen que el TPI erró al imputarles negligencia por la existencia de una condición peligrosa sin considerar la evidencia presentada en torno a la negligencia comparada o contributiva de la señora Ortiz Vizcarrondo. Reiteran que el empleado de limpieza, señor Rodríguez López colocó el cono de seguridad en el área de los condimentos del restaurante para avisarle a todos los comensales y visitantes que el piso estaba húmedo. Añaden que la evidencia desfilada demostró que el cono amarillo de seguridad estuvo visible en todo momento,

---

[156] TPOE, págs. 277-279.
[157] *Id.*, pág. 399, líneas 12-14.

y fue la señora Ortiz Vizcarrondo, quien asumió el riesgo de caminar por el área de los condimentos.  No tienen razón. Veamos.

De entrada, no se desfiló prueba en el juicio que demostrase que la señora Ortiz Vizcarrondo actuó de manera descuidada y que su caída ocurrió debido a su falta de cuidado. La señora Ortiz Vizcarrondo relató que el 18 de septiembre de 2019 cerca de las 12:00 o 12:30 pm salió de su casa y fue al restaurante Wendy's de Río Grande a comprar alimentos.[158] Explicó que la fila de autos en el servi-carro estaba muy larga, por lo que decidió estacionarse y bajarse a comprar los alimentos para llevárselos.[159] Estacionó su auto bastante cerca y fue al *"counter"* en el cual observó que los empleados estaban en *"rush"* porque el servi-carro estaba lleno.[160] Luego hizo su pedido y le dieron su orden. Cuando le entregaron la comida fue a la mesa de los condimentos, se sirvió de ellos y cuando dio media vuelta, caminó varios pasos y se resbaló.[161] Detalló que se cayó con todo el peso de su cuerpo sobre el lado derecho, y que se lastimó cuello, hombro, brazo, cadera y tobillo.[162] Trató de incorporarse y no pudo, por lo que un comensal que estaba en el restaurante la ayudó a incorporarse.[163] Mientras estuvo en el piso sintió que estaba mojado y la señora que la ayudó, le dio una servilleta, para pasarla por la pierna porque estaba mojada.[164]

La señora Ortiz Vizcarrondo declaró que al final de restaurante: *"había un cubo y había un mapo y en ningún momento, en donde yo me caí, había un letrero que dijera que estaba mojado el piso, en ningún momento lo vi"*.[165] Expresó que **antes** de resbalar caminaba normalmente, miró que todo estuviera limpio y sin

---

[158] TPOE, pág. 144, líneas 16-18.
[159] *Ibid.*, líneas 22-24.
[160] *Id.*, pág. 145, líneas 1-5.
[161] *Id.*, pág. 145, líneas 5-12 y pág. 148, líneas 8-12.
[162] *Id*, pág. 145, líneas 12-16.
[163] *Ibid.*, líneas 18-21 y pág. 151, líneas 10-16.
[164] Id., pág. 145, líneas 22-25.
[165] *Id.*, pág. 146, líneas 3-6.

obstáculos. Miró hacia el frente con la comida en la mano y su cartera en el hombro.[166] Reiteró que el cubo y el mapo estaban en dirección a otra puerta de salida, hacia el estacionamiento y no por donde salió.[167]

A su vez, —y contrario a lo argüido por los Apelantes-Demandados— **no se desfiló prueba concluyente** de que el cono amarillo de seguridad estuviera en el área de los condimentos **cuando la señora Ortiz Vizcarrondo se cayó**. Como explicamos antes, la asistente de gerente del restaurante, señora Carmona, no vio la caída y admitió que en el área de la caída acababan de pasar mapo. Asimismo, los Apelantes-Demandados no demostraron que **antes** de la caída verificaron las áreas del restaurante para descubrir posibles condiciones peligrosas. Así también, el testimonio del empleado de limpieza, señor Rodríguez López, resultó en parte confuso y contradictorio en cuanto a la ubicación del cono seguridad al momento de la caída.

En fin, la totalidad de la evidencia desfilada estableció a satisfacción del TPI que la caída sufrida por la señora Ortiz Vizcarrondo ocurrió debido a que resbaló en un área en la que recientemente se había pasado el mapo. No se presentó prueba de que la condición peligrosa en el piso era de tal magnitud como para concluir que la perjudicada asumió un riesgo. Tampoco se demostró que al momento de la caída el cono de seguridad estuviera colocado en el área de la caída. De igual modo, no surge de la prueba que la señora Ortiz Vizcarrondo incurriera en descuido o conducta irresponsable o irrazonable que aportara a la caída y a los daños que sufrió. Ciertamente, los Apelantes-Demandados no ofrecieron prueba alguna que demostrara que la perjudicada fue negligente, ni

---

[166] TPOE, pág. 153, líneas 4-9.
[167] *Id.*, pág. 154, líneas 4-6.

apuntaron que tal comportamiento surja de la prueba presentada. Por lo tanto, el error no fue cometido.

En **tercer orden**, los Apelantes-Demandados alegan que el foro primario hizo caso omiso a la jurisprudencia aplicable en torno a la valoración de los daños. Básicamente, arguyen que las cuantías concedidas no son cónsonas con los precedentes aplicables para otorgar la valoración, ya que no se desglosaron los daños concedidos a los Apelados-Demandantes, ni se discutieron los casos en los cuales se fundamentó la determinación. Por ello, solicitan que se revoque el dictamen apelado para que el TPI realice el análisis correspondiente. No tienen razón. Veamos.

Según se desprende de la jurisprudencia antes reseñada para valorar los daños en casos de responsabilidad extracontractual primero se busca un caso similar reciente y se determina el poder adquisitivo del dólar del año de ese caso similar.[168] Luego, se multiplica la compensación otorgada en el caso similar por el poder adquisitivo del dólar de ese año. Finalmente, dicha suma se divide por el poder adquisitivo del dólar actual.[169] Ciertamente el TPI no pormenorizó con minucia los casos que usó de referencia en su estimado de daños. No obstante, una revisión cuidadosa de la cuantía concedida y la jurisprudencia que en efecto citó el foro primario en la Sentencia apelada, revela que concedió los daños de conformidad con los parámetros vigentes para la adjudicación de compensaciones. Explicamos.

La señora Ortiz Vizcarrondo sufrió una caída en un establecimiento comercial de WENDCO. A partir de ese momento, sus condiciones de salud previas que eran asintomáticas, tales como

---

[168] *Rodríguez et al. v. Hospital et al.*, supra y *Santiago Montañez et al. v. Fresenius*, supra.

[169] Cabe señalar que el poder adquisitivo del dólar del caso anterior similar se obtiene de la división de 100 entre el índice de precios al consumidor del año del precedente legal analizado. A su vez, el poder adquisitivo del dólar actual se obtiene de las estadísticas del Departamento del Trabajo y Recursos Humanos.

escoliosis, discos herniados, [170] lesiones anteriores de rodilla y hombro derecho,[171] se exacerbaron y ahora presenta síntomas.[172] Sufre dolor constante [173] en el lado derecho de la espalda, hombro, cadera y se irradia por la pierna derecha.[174] Ha tenido que aprender a vivir con dolor.[175] Toma medicamentos frecuentemente, dos o tres veces por semana,[176] cuando ya no aguanta el dolor[177] Sus actividades de diario vivir se han visto afectadas, al igual que las familiares.[178] Las partes estipularon un **cinco por ciento (5%) de incapacidad** en su funciones generales. Por su parte, el señor Nieves Falero declaró cómo el accidente le cambió la vida y narró en detalle los sufrimientos y la angustia emocional que experimenta.[179]

El caso que refleja de forma más adecuada una comparación razonable con el caso de epígrafe es el normativo *Colón y otros v. K-mart y otros*, 154 DPR 510, 513-515, 523 (2001) **que, en efecto, fue citado por el TPI**.[180] En este caso, a raíz de la caída sufrida la lesionada sufrió intenso dolor en sus piernas, la espalda y cabeza, padecimientos prolongados por alrededor de tres (3) meses y continuó con intensos dolores, hinchazón y hematomas en la rodilla

---

[170] Véase, *Informe Médico*, pág. 14, Anejo 12 de la *Moción Informativa y en Cumplimiento de Orden*, Entrada 69 del Sistema Unificado de Manejo y Administración de Casos (SUMAC). Véase, además, TPOE, pág. 220, líneas 23-24, pág. 221, líneas 18-25 y pág. 222, líneas 16-19.

[171] TPOE, pág. 227, líneas 12-17.

[172] *Id.*, pág. 327, líneas 11-25.

[173] *Id.*, pág. 193, líneas 4-7.

[174] *Id.*, pág. 184, línea 11-17.

[175] *Id.*, pág. 185 línea 9 y pág. 193, líneas 10-14.

[176] TPOE., pág. 190, líneas 8-9.

[177] *Id.*, pág. 189, líneas 1-4.

[178] *Id.*, págs. 190 a la 192

[179] *Id.*, págs. 90-106.

[180] El foro primario también mencionó los casos *Feliciano Polanco v. Feliciano González*, 147 DPR 722 (1999) y *Marques Matos v. Universal*, KLAN202601862). El caso *Feliciano Polanco v. Feliciano González, supra*, no guarda relación con el caso de autos toda vez que se trata de una persona que sufrió una lesión del ligamento anterior cruzado de la rodilla derecha provocada por un accidente automovilístico. Por su parte, aunque el caso del Tribunal de Apelaciones, *Marques Matos v. Universal, supra*, también se trata de un accidente automovilístico, la persona perjudicada recibió tratamiento médico que incluyó tres "bloqueos" para aliviar el dolor, al igual que la señora Ortiz Vizcarrondo precisó de dicho tratamiento en tres ocasiones para manejar su dolor. Sin embargo, en vista de que el TPI citó uno caso normativo sobre caídas en establecimientos comerciales en el que la persona perjudicada tenía un porcentaje de incapacidad similar al porcentaje estipulado en el caso de autos, resolvemos que resulta innecesario nuestra intervención.

izquierda. La condición fue descrita como una crónica e incapacitante de su pierna izquierda. Al mismo tiempo, sufrió una disminución drástica en sus actividades cotidianas y de disfrutar una vida activa junto a su esposo e hijo. Además, se determinó que tenía una incapacidad equivalente a un **cuatro por ciento (4%)** de sus funciones fisiológicas generales. Por los daños sufridos, se le concedió a la perjudicada una suma de $60,000.00 y al esposo $15,00.00 por concepto de sufrimientos y angustias mentales. La actualización de dicha indemnización, de conformidad con lo establecido en *Rodríguez et al. v. Hospital et al.*, *supra*, y reiterado en *Montañez et al. v. Fresenius Medical*, *supra*, arroja un resultado de $93,600.00 a la lesionada y $17,549.25 al esposo.[181]

En el caso de autos, las partes estipularon que la perjudicada tenía un porcentaje mayor de cinco por ciento (5%) de incapacidad de sus funciones generales. El foro primario le concedió una indemnización de $100,000.00, mientras que a su esposo se le concedió la suma de $20,000.00. Como vemos, las cuantías concedidas en el pleito de marras no distan mucho del valor presente del precedente judicial antes detallado. Tampoco nos parecen sumas exageradamente altas que nos obliguen intervenir con estas. Resulta menester recordar que en diversas ocasiones el Tribunal Supremo ha reiterado que los tribunales apelativos no deben intervenir con la estimación de los daños que los tribunales de instancia realicen, salvo cuando la cuantía concedida advenga ridículamente baja o exageradamente alta.[182] El error no fue cometido.

---

[181] Compensación de la lesionada en el caso original: $60,000.00
Poder adquisitivo del dólar en ese momento = 100/85.70 (índice de precios al consumidor) = 1.17
$60,000 x 1.17 = $70,200/0.75 (poder adquisitivo del dólar abril 2023) = $93,600.00 valoración del daño actualizada.
Compensación del esposo en el caso original: $15,000.00
Poder adquisitivo del dólar = 1.17 (según antes calculado)
$15,000 x 1.17 = $17,550.00/0.75 (según antes calculado) = $17,549.25
[182] *S.L.G. Flores Jiménez v. Colberg*, 173 DPR 843, 864-865 (2008); *Nieves Cruz v. UPR*, 150 DPR, 150, 170 (2000).

En **cuarto orden**, los Apelantes-Demandados afirman que es improcedente la aplicación de la doctrina de expoliación por parte del foro primario. Arguyen que no procede la aplicación de dicha doctrina porque no ha sido adoptada en nuestra jurisdicción. Además, sostienen que lo Apelados-Demandantes no demostraron que la indisponibilidad del video del restaurante de cuando ocurrió la caída le impidiese probar su caso. Añadieron que desde el inicio del pleito no negaron que la señora Ortiz Vizcarrondo sufriera una caída y por lo tanto las imágenes *"no están en controversia"*. Tampoco tienen razón.

Aunque el Tribunal Supremo de Puerto Rico no se ha expresado específicamente sobre la figura de la expoliación de evidencia, nuestro ordenamiento jurídico obliga a las partes a la preservación de la prueba y su destrucción puede provocar la imposición de sanciones. Como expresáramos previamente al discutir las razones por las cuales resultaba improcedente enmendar o eliminar la determinación de hechos **número 19**, la Regla 23.1 de Procedimiento Civil, *supra*, dispone la obligación de preservar prueba sujeta a descubrimiento.

En cuanto a la obligación de preservar información almacenada electrónicamente, dicha Regla 23.1 de Procedimiento Civil, establece que *"estará sujeta a lo dispuesto en la Regla 34.3."* La Regla 34.3 de Procedimiento Civil contempla ciertas sanciones para una parte que impida realizar el descubrimiento de prueba o niegue cumplir con alguna orden.[183]

En lo pertinente a la controversia que atendemos, el incumplimiento del descubrimiento de prueba incluye que *"...hechos designados por el Tribunal, sean considerados como probados a los efectos del pleito..."*.[184] Asimismo, en cuanto a

---

[183] 32 LPRA Ap. V, R. 34.3.
[184] *Id.*

evidencia electrónica, el tribunal no podrá imponer sanciones por no proveer información almacenada electrónicamente, si se demuestra *"que se ha perdido como resultado de la operación rutinaria de buena fe del sistema de almacenamiento electrónico de información, salvo que antes de efectuar dicha operación se le haya requerido a la parte preservar la prueba"*.[185]

Como indicáramos previamente, los Apelados-Demandantes solicitaron copia de evidencia fílmica mucho antes del inicio del pleito, en específico trece (13) días **después** de la caída. Por lo tanto, los Apelantes-Demandados **tenían** la obligación de preservar el video de las cámaras de seguridad.[186] A pesar de ello, no hicieron. Su mayor gestión consistió de —un correo electrónico de la señora Alcántara Moya a la compañía de seguridad ABC— al que no le dieron más seguimiento. Queda claro que los Apelantes-Demandados no preservaron las imágenes de las cámaras de seguridad que les fueron solicitadas. Tampoco demostraron que la pérdida del video ocurrió como resultado de la operación rutinaria de buena fe del sistema de almacenamiento electrónico de información.

Ante ese escenario, resulta innecesario determinar la procedencia de la aplicación o no de la doctrina de expoliación de evidencia. Ello es así, debido a que el TPI pudo tomar por ciertos y probados hechos determinados —como la existencia de una condición peligrosa— y, que los Apelantes-Demandados no tomaron las acciones pertinentes y razonables para atenderla. Por lo cual, no advertimos abuso de discreción en el proceder del foro primario, ni una actuación parcializada, prejuiciada o manifiestamente errónea.

---

[185] *Id.*, inciso (d).

[186] El deber de conservar la evidencia surge cuando razonablemente la persona ha sido notificada por cualquier medio de que un litigio puede ser inminente y que dicha evidencia puede ser relevante a este. Véase, V. Neptune Rivera, *Los retos de la evidencia electrónica*, 76 Rev. Jur. UPR 337, 342 (2007).

**B.**

Por otra parte, en el recurso de apelación **KLAN202300546**, los Apelados-Demandantes esgrimen dos (2) señalamientos de error que, en resumen, alegan que erró el TPI al no dictaminar que los Apelantes-Demandados incurrieron en temeridad y no imponerles los honorarios de abogado correspondientes. No tienen razón.

Aunque los Apelantes-Demandados aceptaron la ocurrencia de la caída de la señora Ortiz Vizcarrondo, lo cierto es que en el pleito hubo controversia en torno a la existencia de una condición peligrosa y el manejo de esta por parte de los empleados del restaurante. Por consiguiente, el pleito de autos no es uno que se pudo obviar. Además, atribuirle negligencia compartida a la perjudicada en un accidente y defenderse en un pleito de daños no equivale a ser temerarios. Tampoco prolongaron innecesariamente el pleito u obligaron a los Apelados-Demandantes a involucrase en trámites eludibles. El ejercicio vigoroso de su derecho a defenderse no equivale a que los Apelantes-Demandados actuaran temeraria o frívolamente. Por lo tanto, no abusó de su discreción el foro primario la rechazar la imposición de honorarios de abogado por temeridad. En fin, examinado el tracto procesal del caso de epígrafe no procede nuestra intervención con la referida determinación.

**C.**

Por último, en el recurso de *certiorari* **KLCE202300698**, los Apelantes-Demandados cuestionan la concesión de costas a favor de los Apelados-Demandantes. En síntesis, alegan que —*al estipularse la caída, el informe pericial, los expedientes médicos de la perjudicada y un cinco por ciento (5%) de incapacidad de esta*— el testimonio de la perito de los Apelados-Demandantes, Dra. Carmen López Acevedo, era innecesario.

Además añaden, que en la Vista sobre Conferencia con Antelación al Juicio las partes acordaron que el testimonio de la

perito se limitaría a explicar los términos médicos. Puntualizan que permitir que la perito se extralimitara en su testimonio durante el juicio constituyó un subterfugio y ocasionó que incurriera en gastos adicionales al tener que presentar durante el juicio el testimonio de su perito, el Dr. Héctor Cortés Santos. También, arguyen que, aunque los Apelados-Demandantes desglosaron un total de trece (13) gastos, únicamente presentaron cinco (5) anejos a su *Memorando de Costas* por lo cual no evidenciaron ocho (8) gastos reclamados como costas y, por ende, incumplieron con la Regla 44.1 de Procedimiento Civil. No tienen razón.

**Primeramente**, no podemos darle el alcance que pretenden los Apelantes-Demandados a la estipulación del porcentaje de incapacidad de la señora Ortiz Vizcarrondo. Examinado el *Informe de Conferencia Entre Abogados Vista Señalada para el 1 de Diciembre de 2021* y la *Minuta* de la Vista con Antelación al Juicio, encontramos que el porcentaje acordado se circunscribe al grado de impedimento de la señora Ortiz Vizcarrondo.[187] En la transcripción de la prueba oral estipulada queda demostrado que las partes no estipularon el testimonio de la perito en cuanto a la causalidad, sino en cuanto al impedimento físico.[188]

De la propia *Resolución* recurrida se desprenden las razones por las cuales el testimonio pericial resultó necesario: *"probar el nexo causal entre el accidente y los daños que reclamaron los Apelados-Demandantes, y para fijar el monto de la compensación…"*.[189]

---

[187] En la *Minuta* de la vista con antelación al juicio consta lo siguiente.
Informó el licenciado Barrau que le había escrito a la parte demandada indicándole que sus clientes estaban en la mejor disposición de acordar un 5% de incapacidad, para efectos de simplificar este caso. Además, sin que ello fuera óbice a que de entender las partes que el perito o uno de los peritos pudiera sentarse a declarar y explicar términos médicos, pero poder tener un **acuerdo en cuanto a algún porciento en relación con los impedimentos**. (Énfasis provisto). Véase, *Minuta*, Anejo 6 del Apéndice del recurso de apelación klan202300536, pág. 58.
[188] TPOE, pág. 209, línea 17 a la pág. 210, línea 25.
[189] Véase, *Resolución*, Anejo 11 del Apéndice del recurso de *certiorari* KLCE202300698, pág. 85.

Reiteramos que la relación causal es un elemento imprescindible en una reclamación por daños y perjuicios y, por lo tanto, el TPI no abusó de su discreción al permitir el testimonio pericial para determinar cuál fue la causa próxima de los daños.[190] Por otro lado, el argumento de que los Apelados-Demandantes no presentaron anejos suficientes para demostrar gastos resulta patentemente inmeritorio, toda vez que gastos tales como sellos, diligenciamientos y juramentación de contestaciones al descubrimiento de prueba son necesarios y ordinarios durante el trámite de cualquier causa de acción.

A la luz de la totalidad de las circunstancias en el presente caso, la *Resolución* recurrida fue realizada dentro de los parámetros de la corrección en derecho y el sano ejercicio de discreción judicial.

**-IV-**

Por los fundamentos que anteceden, se **confirma** la *Sentencia* apelada en los casos KLAN202300536 y KLAN202300546. Asimismo, se expide el auto de *certiorari* KLCE202300698 y se **confirma** la *Resolución* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[190] El TPI delimitó el testimonio de la perito de los Demandantes al asunto de la causalidad de los daños. A su vez, le permitió al representante legal de los Demandados objetar las preguntas que se apartaran del alcance permitido de dicho testimonio. TPOE, pág. 214, líneas 12-20.